## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

LANDIN GOLOJA,
TYLER MAYBEE,
CAITLAN REYNOLDS, and
DANIEL SHEINER, on behalf of
themselves and all others similarly situated,

                    Plaintiffs,

v.

VAIL RESORTS, INC., and
ALTERRA MOUNTAIN COMPANY,

                    Defendants.

---

## CLASS ACTION COMPLAINT

---

Plaintiffs Landin Goloja, Tyler Maybee, Caitlan Reynolds, and Daniel Sheiner ("Plaintiffs"), on behalf of themselves and all others similarly situated, upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action complaint against Defendants Vail Resorts, Inc. ("Vail Resorts") and Alterra Mountain Company ("Alterra") (together, "Defendants") for violations of federal and state laws.

## I.   NATURE OF THE ACTION

1. When Vail Resorts' flagship ski resort, Vail, opened on December 15, 1962, lift tickets were $5. When Alterra's Storm Mountain ski area—now known as Steamboat Resort—opened a few weeks later, on January 12, 1963, total lift ticket sales for the day tallied just $13.75.

2. The ski resort business has changed dramatically since those early days. Countless mergers and acquisitions over the last 30 years, coupled with numerous contractual partner relationships, have resulted in the creation of two—and only two— behemoth ski resort owner/operators in the United States: Vail Resorts and Alterra.

3. As of 2026, Vail Resorts owns and/or operates 42 ski areas, and it contracts with several partners to provide access to approximately 30 additional ski resorts. As of 2026, Alterra owns and/or operates 18 ski areas, and it contracts with several partners to provide access to approximately 70 additional ski areas. Throughout the complaint, Plaintiffs will use the generic term "ski area" to refer to any site designed and managed primarily for skiing, snowboarding, or other downhill snow sports.

2

4.      Generally, ski areas in North America can be grouped into two categories: "Destination Ski Resorts" and "Regional Ski Areas." As Vail Resorts explained in its most recent Annual Report, a Destination Ski Resort is a ski area "which generally receives a meaningful portion of skier visits from long-distance travelers," while a Regional Ski Area "tend[s] to generate skier visits predominantly from [its] respective local market[]."[1] Vail Resorts and Alterra each comprise an extensive combination of Destination Ski Resorts and Regional Ski Areas. No other ski area owner or operator comes close. Nor can it, as Vail Resorts and Alterra have locked up every Destination Ski Resort in the country, either through ownership or by contract, as well as many of the most popular Regional Ski Areas.

5.      Skiing and snowboarding are major recreational activities in North America, generating tens of millions of lift-served visits each year. The number of unique ski and snowboard participants have also reached all-time highs in recent years, with the 2022-2023 season setting a record with 11.6 million unique participants. As a result, the North American ski resort industry generates billions of dollars annually.

6.      Vail Resorts and Alterra offer a range of ski lift tickets and passes, the prices of which have skyrocketed as Vail Resorts' and Alterra's market shares have grown. For example, for the 2025-2026 ski season, single-day lift tickets at Vail and Steamboat resorts purchased at the ticket booth can cost over $300.

---

[1] Vail Resorts, Inc. Form 10-K (2025) at 5.

7.      The most popular ski pass offered to skiers and snowboarders by both Vail Resorts and Alterra is their multi-mountain season passes (referred to herein as a "Mega Passes"). Mega Passes have fundamentally changed skiing and snowboarding in North America. Indeed, at certain ski areas affiliated with these Mega Passes, visitors mostly consist of these passholders.

8.      Vail Resorts' flagship Mega Pass is called the "Epic Pass," which grants pass holders unlimited and unrestricted access to all of Vail Resorts' 42 owned and operated ski areas, including Destination Ski Resorts and Regional Ski Areas, in addition to a limited number of days at several partner ski areas. Since debuting in 2008, the number of Epic Pass members has surged from 60,000 to over 2 million annually. While Vail Resorts offers different Epic Pass products (described below), Plaintiffs refer to all of these multi-mountain season pass products as "Mega Passes."

9.      Alterra's flagship Mega Pass is called the "Ikon Pass," which grants passholders unlimited and unrestricted access to 18 ski areas, including Destination Ski Resorts and Regional Ski Areas, in addition to a limited number of days at about 50 partner ski areas. Upon information and belief, there are nearly 1 million Ikon Pass members. While Alterra offers different Ikon Pass products (described below), Plaintiffs refer to all of these multi-mountain season pass products as "Mega Passes."

10.     When an individual purchases an Epic or Ikon Pass, he or she is essentially purchasing access to a bundle of Destination Ski Resorts and Regional Ski Areas owned or operated by either Vail Resorts or Alterra, as well as a number of

4

partners. Ski areas on the Epic Pass and Ikon Pass are located in virtually all skiable areas across North America.

**Figure 1. North American Ski Areas on Epic Pass or Ikon Pass.[2]**



11. The prices of the Epic Pass and Ikon Pass are steep and have been rapidly rising well beyond the rate of inflation. Yet the sale of the Epic Pass and Ikon Pass have become the primary source of lift revenues and resort visitation for Vail

---

[2] Map, *Epic or Ikon*, *available at* https://www.epicorikon.com/map

Resorts and Alterra over the years. For example, for Fiscal Year 2025, Vail Resorts' various Epic Passes provided 65% of lift revenue and 75% of lift visitations.[3] As a result, Vail Resorts and Alterra make every effort to drive more and more people to purchase their respective Mega Passes. But in order to do so, they each have resorted to an anticompetitive scheme that, as alleged herein, violates the antitrust laws.

12.     Following the introduction of Defendants' Mega Passes, the prices of daily or short term (e.g. weekend) lift tickets purchased during the ski season ("Lift Tickets") have climbed sharply. But this is no accident, or the result of competitive market forces. Pursuant to Defendants' identical anticompetitive schemes, Lift Tickets for ski areas within the Epic and Ikon ecosystems are priced in a way to induce (or coerce) customers into buying the Mega Pass bundles.

13.     The primary (and unlawful) way that both Vail Resorts and Alterra drive skiers and snowboarders to purchase Mega Passes is to charge exorbitantly high prices for Lift Tickets. This coerces customers into buying their multi-mountain season pass offerings (the Epic and Ikon Mega Passes) which they then view as more cost effective as compared to a Lift Ticket.

14.     Vail Resorts' current CEO Rob Katz, who also served as CEO of the company from 2006-2021, confirmed that this has been Vail Resorts' strategy. At the end of 2025, Katz told *The New York Times* that "**Vail's lift-ticket prices have been**

---

[3] Vail Resorts, Inc. Form 10-K (2025) at 10.

**'intentionally' aggressive . . . They pushed customers to buy Epic Passes.**"[4] In February 2026, Katz admitted in an interview with *The Wall Street Journal* that Vail Resorts' tactics have raised the price of Lift Tickets industry wide:

> *WSJ*: One of the critiques that people have about Epic Pass broadly . . . is that the price of lift tickets has gone up and it has forced others or pushed lift tickets up across the industry. Do you think that that is a fair criticism?

> *Katz*: I think it's a fair point. This was an industry wide . . . transformation that happened that our company absolutely led.[5]

15. Skiers and snowboarders are led to believe they are making a cost-conscious decision in buying the Epic or Ikon Mega Pass, but in reality, and as a result of Vail Resorts' and Alterra's respective anticompetitive schemes involving bundling, they are in fact being forced into buying a Mega Pass, which is itself maximally (over)-priced up to the point where it looks like a good deal when compared to the over-priced Lift Ticket. In short, both the Lift Ticket and the Mega Pass are over-priced.

16. Unfortunately, as the Mega Passes have displaced Lift Tickets in the ski industry, the cost of skiing and snowboarding in North America has become excessive, crowding out more price-sensitive locals. Price increases are directly tied to Defendants' identical anticompetitive schemes to raise the prices of Lift Tickets and Mega Passes.

---

[4] Andrew Ross Sorkin, *et al.*, DealBook Newsletter, *The New York Times* (December 12, 2025), *available at* https://www.nytimes.com/2025/12/12/business/dealbook/ellison-paramount-oracle-warner-bros-financing.html

[5] "How Vail Changed the Economics of the Entire Ski Industry," *The Wall Street Journal* (February 26, 2026), *available at* https://www.wsj.com/video/series/in-depth-features/how-vail-changed-the-economics-of-the-entire-ski-industry/76B54497-21C5-4820-981E-CC3FB02C9970?mod=hp_lista_pos1

17.    Defendants have engaged in conduct to raise the costs of Lift Tickets and Mega Passes to the detriment of Plaintiffs and members of the Class. Specifically, through the Epic Pass and Ikon Pass, Defendants use the market power they have in the market for Destination Ski Resorts—virtually every Destination Ski Resort is on either the Epic Pass or Ikon Pass—to restrain competition in the market for Regional Ski Areas by bundling access to Destination Ski Resorts to access to Regional Ski Areas. These anticompetitive bundles have raised costs and reduced quality for all skiers and snowboarders regardless of whether they purchase a Lift Ticket or Mega Pass.

18.    This lack of competition has been to the detriment of Plaintiffs and members of the Class (defined below) and has caused them to pay supracompetitive prices for Lift Tickets and Mega Passes during the Class Period (defined below). Plaintiffs bring this class action Complaint against Defendants for violations of federal and state antitrust laws and common law and seek to recover damages for the overpayment of Lift Tickets and Mega Passes, as well as other relief.

## II.    JURISDICTION AND VENUE

19.    **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Additionally, this Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are

more than one hundred members in the proposed Class; and at least one member of the proposed Class is a citizen of a state different from Defendants.

20. **Supplemental Jurisdiction**. In addition to violations of the federal antitrust laws, Plaintiffs also allege violations of state antitrust law and well as unjust enrichment. All claims under federal and state law are based upon a common nucleus of operative fact and the entire action, therefore, should be commenced in a single case to be tried as one judicial proceeding. This Court, therefore, has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a). Exercising jurisdiction over the state law claims will avoid unnecessary duplication of actions and support the interests of judicial economy, convenience to the litigants, and fairness.

21. **Personal Jurisdiction**. This Court has personal jurisdiction over Defendants because they transact business or may otherwise be found in this District. Moreover, Defendants are both headquartered in this District and own or operate several ski resorts located in this District.

22. **Venue.** Venue in this District is proper as Defendants are headquartered in this District. Venue is also proper in this District because Defendants' conduct, as alleged herein, caused harm to Class members in this District.

23. **Interstate Commerce**. Defendants' conduct as alleged herein substantially affects interstate trade and commerce by harming competition, raising prices, restricting output, and harming Class members throughout the United States.

### III.    PARTIES

#### 1.   Plaintiffs

24.    Plaintiff Landin Goloja is an individual and a Colorado resident. During the Class Period, Mr. Goloja purchased an Epic Pass product from Vail Resorts and an Ikon Pass product from Alterra. As a result of Defendants' identical anticompetitive practices, Mr. Goloja paid higher prices for these Mega Passes.

25.    Plaintiff Tyler Maybee is an individual and a Colorado resident. During the Class Period, Mr. Maybee purchased an Ikon Pass product from Defendant Alterra. As a result of Alterra's anticompetitive practices, Mr. Maybee paid higher prices for this Mega Pass.

26.    Plaintiff Caitlan Reynolds is an individual and a Colorado resident. During the Class Period, Ms. Reynolds purchased an Ikon Pass product from Defendant Alterra. As a result of Alterra's anticompetitive practices, Ms. Reynolds paid higher prices for this Mega Pass.

27.    Plaintiff Daniel Sheiner is an individual and a Massachusetts resident. During the Class Period, Mr. Sheiner purchased Lift Tickets from Vail Resorts and an Ikon Pass product from Defendant Alterra. As a result of Defendants' identical anticompetitive practices, Mr. Sheiner paid higher prices for Lift Tickets and his Mega Pass.

## 2. Defendants

### a. Vail Resorts

28.    Vail Resorts, Inc. is a Delaware corporation with its principal executive offices located at 390 Interlocken Crescent, Broomfield, Colorado 80021. Vail Resorts is a leading global mountain resort operator, with its common stock traded on the New York Stock Exchange under the symbol "MTN."

29.    Vail Resorts owns and/or operates several of the most visited and recognized Destination Ski Resorts in North America, including Vail, Breckenridge, Keystone, Beaver Creek, Park City, and Whistler Blackcomb.

30.    Since 2008, Vail Resorts has sold the Epic Pass, a Mega Pass that grants access to dozens of Destination Ski Resorts and Regional Ski Areas across North America.

### b. Alterra

31.    Alterra Mountain Company is a Delaware corporation with its principal executive offices located at 3501 Wazee St., Ste. 400, Denver, Colorado 80216. Alterra is a leading global mountain resort operator. Alterra Mountain Company was created when affiliates of KSL Capital Partners, owner of the Lake Tahoe ski resort now known as Palisades Tahoe, and Henry Crown and Company purchased Intrawest (the former owner or operator of Steamboat, Winter Park, Stratton, and other ski areas) Mammoth Resorts, and Deer Valley Resort in 2017 through a joint venture. Alterra is a privately held company.

32.　Alterra owns and/or operates several of the most visited and recognized Destination Ski Resorts in North America, including Steamboat, Winter Park, Deer Valley, Palisades Tahoe, and Mammoth Mountain.

33.　Since 2018, Alterra has sold the Ikon Pass, a Mega Pass that grants access to dozens of Destination Ski Resorts and Regional Ski Areas across North America.

### 3.  Other Non-Parties

34.　Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

35.　Defendants are also liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

## IV.  FACTUAL ALLEGATIONS

### A.　North American Ski Resort Industry

36.　The North American ski resort industry generates billions of dollars annually. It consists of nearly 800 lift-served ski areas located almost entirely in the United States and Canada. These ski areas are concentrated in the colder, mountainous regions of North America, including the Rocky Mountain region, the Sierra Nevada region, the Pacific Northwest, the Northeast, and the Great Lakes regions. In the United States, the National Ski Areas Association ("NSAA") reported that as of October 2024 there were 486 operating ski areas spread across 37 states.

37.      Skiing and snowboarding are major recreational activities in North America, generating tens of millions of lift-served visits each year.

38.      Following the brunt of the COVID-19 pandemic in 2020, U.S. ski areas have experienced a significant increase in visitation. Since 2021, the U.S. ski industry has counted four of its five busiest seasons ever. The NSAA indicated that there were approximately 61.5 million skier visits during the 2024/2025 season, the second highest showing for American ski areas. Across North America there were approximately 81.1 million skier visits during the 2024/2025 season.

39.      The number of unique ski and snowboard participants have also reached all-time highs in recent years. The 2022-2023 season set a record with 11.6 million unique participants.

40.      Generally, ski areas in North America can be grouped into two categories: "Destination Ski Resorts" and "Regional Ski Areas." As Vail Resorts explained in its most recent Annual Report, a Destination Ski Resort is a resort "which generally receives a meaningful portion of skier visits from long-distance travelers," while a Regional Ski Area "tend[s] to generate skier visits predominantly from [its] respective local market[]."[6]

### 1. Destination Ski Resorts

41.      In general, Destination Ski Resorts are larger than Regional Ski Areas and give visitors access to a variety of trails and lifts. Destination Ski Resorts such as Vail or Jackson Hole typically have on-mountain hotel accommodations or are short drives to

---

[6] Vail Resorts, Inc. Form 10-K (2025) at 5.

accommodations. Destination Ski Resorts are popular nationwide and are highly regarded by skiing enthusiasts and professionals for the quality of their terrain and amenities.

42.     Vail Resorts identifies the following owned and operated North American ski resorts as Destination Ski Resorts:

- **Vail Mountain Resort (CO)**: The second most visited ski area in the United States for the 2024/2025 ski season. Vail Mountain is comprised of approximately 5,300 skiable acres, 278 runs, and 32 lifts.

- **Breckenridge Ski Resort (CO)**: The most visited ski area in the U.S. for the 2024/2025 ski season. Breckenridge is comprised of approximately 3,000 skiable acres, 187 runs, and 35 lifts.

- **Park City Resort (UT):** The fourth most visited ski area in the U.S. for the 2024/2025 ski season and the largest by acreage in the U.S. Park City offers 7,300 skiable acres.

- **Keystone Resort (CO)**: The ninth most visited ski area in the U.S. for the 2024/2025 ski season, as well as the largest area for night skiing in Colorado. Keystone is comprised of approximately 3,000 skiable acres, 140 runs, and 21 lifts.

- **Beaver Creek Resort (CO)**: The tenth most visited ski area in the U.S. for the 2024/2025 ski season. Beaver Creek is comprised of approximately 2,000 skiable acres, 167 runs, and 24 lifts.

- **Crested Butte Mountain Resort (CO)**: Over 1,500 skiable acres.

14

- **Whistler Blackcomb (BC):** The largest year-round ski area in North America, with two mountains connected by the PEAK 2 PEAK gondola, which combined offer over 8,000 skiable acres and 200 runs.

- **Heavenly Mountain Resort (CA):** The thirteenth most visited ski area in the U.S. for the 2024/2025 ski season, with over 4,800 skiable acres.

- **Northstar Resort (CA)**: Over 3,000 skiable acres.

- **Kirkwood Mountain Resort (CA)**: Over 2,300 skiable acres.

43.    Alterra also owns and/or operates several resorts that meet the criteria of Destination Ski Resorts, including:

- **Mammoth Mountain (CA):** Among the most visited ski areas in the United States. Mammoth is comprised of approximately 3,500 skiable acres, 175 runs, and 25 lifts.

- **Palisades Tahoe (CA):** Among the most visited ski areas in the United States. Palisades is comprised of approximately 3,600 skiable acres, 170 runs, and 29 lifts.

- **Steamboat (CO):** Comprised of approximately 3,700 skiable acres, 181 runs, and 23 lifts.

- **Winter Park (CO):** Comprised of approximately 3,000 skiable acres, 171 runs, and 23 lifts.

- **Deer Valley (UT):** Comprised of 4,300 skiable acres, 202 runs, and 31 lifts.

44.    In addition to the above ski areas, both Vail Resorts and Alterra have partnerships with other Destination Ski Resorts in North America (which they do not

own or operate) and offer unlimited or limited access on their respective Mega Passes. Some notable examples include:

- **Telluride (CO/Epic Pass)**: Comprised of 2,000 skiable acres, 148 runs, and 17 lifts.

- **Jackson Hole Mountain Resort (WY/Ikon Pass)**: Comprised of 2,500 skiable acres, 131 runs, and 16 lifts.

- **Aspen Snowmass (CO/Ikon Pass)**: Comprised of four large, interconnected ski areas. Aspen Snowmass is owned and operated by Aspen Skiing Company, L.L.C. The Henry Crown Company—one of the founding partners of Alterra—also owns Aspen Skiing Company.

- **Copper Mountain (CO/Ikon Pass)**: Comprised of 2,500 skiable acres, 157 runs, and 24 lifts.

45.    Furthermore, Destination Ski Resorts include those properties considered by the NSAA as an "Extra-Large" ski mountain. Extra-Large mountains are those that measure over 20,000 vertical transportation feet per hour (VTF/h). VTF/h measures the vertical rise of a ski lift multiplied by the hourly lift capacity.

46.    For the 2023/2024 ski season, NSAA reported that there were 31 Extra-Large mountains. While the NSAA does not specify the ski areas that fall into the Extra-Large category, the resorts publish information that allows estimation of each mountain's VTF/h. As shown in the Figures below, for all but two Extra-Large mountains, lift access was included on either the Epic Pass or the Ikon Pass, or 93% of the Extra-Large ski areas in the United States.

**Figure 2. NSAA Extra-Large Ski Mountains**

|  | *Estimated VTF/h* | *MOUNTAIN* | *OWNER* | *MEGA PASS AFFILIATIONS* |
|---|---|---|---|---|
| 1 | 4032412 | Park City | Vail Resorts | Epic Pass |
| 2 | 3130022 | Palisades Tahoe | Alterra | Ikon Pass |
| 3 | 2861529 | Deer Valley | Alterra | Ikon Pass |
| 4 | 2622385.2 | Vail Mountain | Vail Resorts | Epic Pass |
| 5 | 1951496 | Breckenridge | Vail Resorts | Epic Pass |
| 6 | 1933067.4 | Big Sky | Boyne Resorts | Ikon Pass |
| 7 | 1548652 | Mammoth | Alterra | Ikon Pass |
| 8 | 1435896 | Beaver Creek | Vail Resorts | Epic Pass |
| 9 | 1189859 | Winter Park | Alterra | Ikon Pass |
| 10 | 1157636 | Heavenly | Vail Resorts | Epic Pass |
| 11 | 1073190 | Steamboat | Alterra | Ikon Pass |
| 12 | 1059182 | Killington | Phill Gross | Ikon Pass |
| 13 | 918886.5 | Snowmass | Aspen Skiing Company | Ikon Pass |
| 14 | 914441.2 | Copper Mountain | Powdr | Ikon Pass |
| 15 | 770270 | Keystone | Vail Resorts | Epic Pass |
| 16 | 723189.6 | Sunday River | Boyne Resorts | Ikon Pass |
| 17 | 596745 | Okemo | Vail Resorts | Epic Pass |

17

|    | Estimated VTF/h | MOUNTAIN | OWNER | MEGA PASS AFFILIATIONS |
|----|-----------------|----------|-------|------------------------|
| 18 | 594572.4 | Northstar | Vail Resorts | Epic Pass |
| 19 | 583000.6 | Telluride | Independent | Epic Pass |
| 20 | 535624 | Mount Bachelor | Powdr | Ikon Pass |
| 21 | 484811 | Sugarbush | Alterra | Ikon Pass |
| 22 | 453600 | Mount Snow | Vail Resorts | Epic Pass |
| 23 | 436363.2 | Snowbasin | Holding Family | Ikon Pass |
| 24 | 394275 | Jackson Hole | Independent | Ikon Pass |
| 25 | 349790 | Whitefish | Independent | n/a |
| 26 | 322940 | Stowe | Vail Resorts | Epic Pass |
| 27 | 287620 | Snowbird | Powdr | Ikon Pass |
| 28 | 252051.6 | Loon | Boyne Resorts | Ikon Pass |
| 29 | 247770.9 | Crested Butte | Vail Resorts | Epic Pass |
| 30 | 228800 | Crystal Mountain WA | Alterra | Ikon Pass |
| 31 | 218290 | Sugar Bowl | Independent | n/a |

*Note:* **During the Class Period, other ski passes granted access to certain Extra-Large ski mountains.**

**Figure 3.**



NSAA Extra-Large Ski Mountains Mega Pass Affiliation Share

### 2. Regional Ski Areas

47. As stated above, a Regional Ski Area "tend[s] to generate skier visits predominantly from [its] respective local market[]."[7] These ski areas tend to be smaller than Destination Ski Resorts and have fewer amenities such as onsite hotels and restaurants.

48. Both the Epic Pass and the Ikon Pass offer unlimited or limited access to dozens of Regional Ski Areas throughout North America. Most are located near large

---

[7] Vail Resorts, Inc. Form 10-K (2025) at 5.

population centers. In its 2025 Annual Report, Vail Resorts commented that its "ski resort network" allows it to connect guests with "drive-to access" to Regional Ski Areas to "destination resort access on a single pass product." It stated that "[b]uilding a presence near major metropolitan areas with large populations enables us to drive advance commitment pass product sales among a broad array of guests."[8]

49.    The Epic Pass offers access to the following Regional Ski Areas (among others):

- **Hunter Mountain (NY):** 2 hours from New York City.

- **Stowe (VT), Okemo (VT), Mount Snow (VT), Mount Sunapee (NH), Attitash (NH), Wildcat (NH):** Within driving distance from New York City, Boston, and the greater New England market.

- **Stevens Pass (WA):** 1.5 hours from Seattle.

- **Jack Frost-Big Boulder (PA**): 2 hours from New York City and Philadelphia.

- **Seven Springs (PA), Laurel Mountain (PA), and Hidden Valley (PA):** 1.5 hours from Pittsburgh.

50.    The Epic Pass also offers access to several Regional Ski Areas in the Midwest that draw guests from Chicago, Detroit, Minneapolis, St. Louis, Indianapolis, Cleveland, Kansas City, Louisville, among others.

---

[8] Vail Resorts, Inc. Form 10-K (2025) at 6.

51.    The Ikon Pass offers access to a similar range of Regional Ski Areas located near large population centers. These include (among others):

- **Eldora (CO):** 1 hour from Denver; 30 minutes from Boulder.

- **Big Bear (CA):** 2.5 hours from Los Angeles.

- **Stratton (VT), Sugarbush (VT), Killington (VT), Sunday River (ME), Sugarloaf (ME):** Within driving distance from New York City, Boston, and the greater New England market.

- **Loon Mountain Resort (NH):** 2 hours from Boston.

- **Camelback (PA) and Blue Mountain (PA):** Less than 2 hours from New York City and Philadelphia.

- **Snowshoe Mountain (WV):** Within driving distance from Washington D.C., Baltimore, and Richmond.

- **Blue Mountain Resort (Ontario):** 1.5 hours from Toronto.

**B.    The Rise of Vail Resorts, Alterra, and the Mega Pass**

52.    Defendants Vail Resorts and Alterra and their respective Mega Passes have fundamentally changed skiing and snowboarding in North America, to the detriment of Plaintiffs and members of the Class. In short, Defendants' schemes have made snow sports prohibitively expensive.

**1.  Vail Ski Resort Opens**

53.    The history of Vail Resorts starts on March 19, 1957, when World War II veterans Pete Seibert and Earl Eaton parked Seibert's army-surplus jeep on the side of U.S. Highway 6 (years before I-70 was built), attached climbing skins to their skis, and

trekked up what would become the front side of Vail ski resort in what would become the town of Vail, Colorado (incorporated in 1966).

54. When Seibert and Eaton reached the summit, Seibert recognized the potential for a ski resort. He described the area as "the most mind-blowing landscape of all: a series of bowls stretched to the horizon, a virtually treeless universe of boundless powder, open slopes, and open sky."[9]

55. By the end of 1959, Seibert secured a permit from the U.S. Forest Service to develop a ski area. At the same time, Seibert and several investors formed Vail Associates—the company that would eventually become Vail Resorts—to raise sufficient cash to build a ski area and a base village.

56. Vail ski resort opened on December 15, 1962, with one gondola (one of the first in the United States) and two double chairlifts, serving six square miles of skiable terrain. Lift tickets were $5 (about $53 today after adjusting for inflation).

57. Vail ski resort quickly earned the reputation as one of North America's most recognized ski areas. Indeed, President Gerald Ford owned a house in Vail, further popularizing Vail as a destination for skiers.

---

[9] David O. Williams, "50 Years of Vail in Words and Pictures," *Vail-Beaver Creek Magazine* (July 1, 2016), *available at* https://www.vailmag.com/news-and-profiles/2016/07/charting-vails-evolution-from-sheep-pasture-to-center-of-the-skiing-universe



**Figure 4. Members of the US Olympic Ski Team skiing in Vail.[10]**

58.    By the 1970s, Vail Associates had ambitions to grow beyond Vail ski resort, and it was granted a permit to develop another ski area approximately ten miles west of Vail. Here, Vail Associates developed Beaver Creek, which opened on December 15, 1980.

### 2.  From Vail Associates to Vail Resorts

59.    In 1992, Apollo Ski Partners, a company spun-off of Apollo Advisors (now known as Apollo Global Management, Inc.), acquired Vail Associates and incorporated as Vail Resorts, Inc. By the end of the 1990s, Vail Resorts' ski empire began to take shape.

60.    In July 1996, Vail Resorts announced it would acquire three large Colorado ski areas from Ralston Resorts: Keystone, Breckenridge, and Arapahoe

---

[10] *Id.*

Basin. The proposed acquisition was reviewed by the U.S. Department of Justice, Antitrust Division ("DOJ"), as Vail Resort and Ralston Resorts were the two largest owner/operators of ski resorts in Colorado at that time. While DOJ ultimately allowed the transaction, as part of the deal, Vail Resorts had to divest Arapahoe Basin. In its competitive impact statement, DOJ stated that "if the merger were allowed to take place without any divestiture, there would be an overall average increase in Front Range discounted lift ticket prices on the order of 4%, or about $1 per lift ticket on average to all Front Range customers, with higher price increases at the merging firms' resorts."[11] Today, Arapahoe Basin is owned by Alterra.

61.　With the Ralston acquisition cleared by DOJ, Vail Resorts became a public company on February 4, 1997.

62.　In the years following its IPO, Vail Resorts began aggressively acquiring additional ski areas. While its acquisition activity was initially focused on the western United States, starting in the early 2010s, it started acquiring properties in all skiable areas in the United States and around the world.

63.　Many of the ski areas it acquired are world-class, long running Destination Ski Resorts such as Park City (Utah), Crested Butte (Colorado), and Whistler Blackcomb (B.C., Canada).

64.　Vail Resorts also went on a buying spree of popular Regional Ski Areas located near large population centers. These Regional Ski Areas include: Hunter

---

[11] Competitive Impact Statement, *U.S. et al. v. Vail Resorts, Inc., et al.*, No: 97-B-10 (January 22, 1997).

Mountain (Catskills, New York; 2 hours from New York City); Stowe, Okemo, and Mount Snow (Vermont; popular day or weekend trips from major cities in the northeast); Mount Sunapee (New Hampshire; 1.5 hours from Boston); Stevens Pass (Washington; 1.5 hours from Seattle); and Jack Frost-Big Boulder (Poconos, Pennsylvania; 2 hours from New York City and Philadelphia).

65.    Vail Resorts' acquisition strategy continues today. Its most recent acquisitions in the United States took place on December 31, 2021, when it acquired three more Pennsylvania ski areas: Seven Springs, Laurel Mountain, and Hidden Valley. Concerning these three ski areas, Vail Resorts touted that these properties are "strategically located near Pittsburgh, expanding our presence in the Mid-Atlantic region and generating incremental drive-to business from other major metropolitan areas such as Washington DC, Baltimore and Cleveland."[12]

66.    Vail has also recently acquired two large European ski resorts, Andermatt-Sedrun and Crans-Montana in Switzerland.

67.    Vail Resorts' Destination Ski Resorts are some of the most popular in the United States. For the 2023/2024 ski season, Vail Mountain Resort, Breckenridge Ski Resort, and Park City Resort were the first, second and third most visited ski areas in the United States. For the 2024/2025 season, these properties were, respectively, the second, first, and fourth most visited ski areas in the United States.

---

[12] Vail Resorts, Inc. Form 10-K (2024) at 11.

68.     As of 2025, Vail Resorts owns 42 ski areas, but it intends to continue to acquire more. When asked whether Vail Resorts would acquire additional ski areas during a December 2024 earnings call, former Vail Resorts CEO Kristen Lynch said that Vail is always looking for "more families or owners of assets who want to make a transition" and that Vail believes "there are specific areas in North America we would like to acquire."[13]

69.     The Figures below identify all Vail Resorts' ski areas, including information about when the properties were acquired and where they are located:

**Figure 5: Vail Resorts Acquisition History**

| Resort | Location | Acquisition Year |
| --- | --- | --- |
| Vail Mountain | Colorado | - |
| Beaver Creek Resort | Colorado | - |
| Breckenridge Ski Resort | Colorado | 1997 |
| Keystone Resort | Colorado | 1997 |
| Heavenly Mountain Resort | California | 2002 |
| Northstar California Resort | California | 2010 |
| Kirkwood Mountain Resort | California | 2012 |

---

[13] Jason Blevins, "Vail Resorts watching for new ski areas to buy, sold 2.3M passes and tickets heading into season," *Colorado Sun* (Dec. 13, 2024), *available at* https://coloradosun.com/2024/12/13/vail-resorts-pass-sales.

| | | |
|---|---|---|
| **Afton Alps** | Minnesota | 2012 |
| **Mt. Brighton** | Michigan | 2012 |
| **Canyons Resort** | Utah | 2013 |
| **Park City Mountain Resort** | Utah | 2014 (In 2015, Vail Resorts merged Park City and Canyons into one resort) |
| **Perisher Ski Resort** | Australia | 2015 |
| **Wilmot Mountain Ski Resort** | Wisconsin | 2016 |
| **Whistler Blackcomb** | British Columbia, Canada | 2016 |
| **Stowe Mountain Resort** | Vermont | 2017 |
| **Crested Butte Mountain Resort** | Colorado | 2018 |
| **Mount Sunapee Resort** | New Hampshire | 2018 |
| **Okemo Mountain Resort** | Vermont | 2018 |
| **Stevens Pass** | Washington | 2018 |
| **Falls Creek** | Australia | 2019 |
| **Hotham Alpine Resort** | Australia | 2019 |
| **Paoli Peaks** | Indiana | 2019 |
| **Hidden Valley Ski Resort** | Missouri | 2019 |
| **Snow Creek Ski Area** | Missouri | 2019 |
| **Attitash Mountain Ski Area** | New Hampshire | 2019 |

| **Crotched Mountain Resort** | New Hampshire | 2019 |
|---|---|---|
| **Wildcat Mountain Ski Area** | New Hampshire | 2019 |
| **Hunter Mountain** | New York | 2019 |
| **Boston Mills Ski Resort** | Ohio | 2019 |
| **Brandywine Ski Resort** | Ohio | 2019 |
| **Mad River Mountain** | Ohio | 2019 |
| **Alpine Valley Resort** | Ohio | 2019 |
| **Jack Frost Ski Resort** | Pennsylvania | 2019 |
| **Big Boulder Ski Resort** | Pennsylvania | 2019 |
| **Roundtop Mountain Resort** | Pennsylvania | 2019 |
| **Whitetail Resort** | Pennsylvania | 2019 |
| **Liberty Mountain Resort** | Pennsylvania | 2019 |
| **Mount Snow Resort** | Vermont | 2019 |
| **Seven Springs Mountain Resort** | Pennsylvania | 2021 |
| **Hidden Valley Resort** | Pennsylvania | 2021 |
| **Laurel Mountain Ski Area** | Pennsylvania | 2021 |
| **Andermatt-Sedrun** | Switzerland | 2022 |
| **Crans-Montana** | Switzerland | 2023 |

**Figure 6: Vail Resorts' Ski Areas.**



### 3. Vail Resorts Begins Selling the Epic Pass

70.     Vail Resorts introduced the Epic Pass in 2008 as a response to

challenges faced by the ski industry: "trends in snowfall variability, rising operational

costs, and shifting skier preferences prompted the need for a disruptive pricing and

marketing approach."[14] The Epic Pass gives pass holders unlimited and unrestricted

access to all of Vail Resorts' ski areas in addition to a limited number of days at several

partner resorts. Since debuting in 2008, the number of Epic Pass members surged from

---

[14] Gad Allon, "Ski Lift Pricing and the Lessons from Vail's Challenge," *Gad's Newsletter* (Jan. 13, 2025), *available at* https://gadallon.substack.com/p/ski-lift-pricing-and-the-lessons

60,000 to over 2 million. Vail Resorts sold 2.3 million Epic Passes for the 2024-2025 season.

71.    In addition to the flagship Epic Pass, Vail Resorts offers less expensive passes with more restrictions. The "Epic Local Pass" provides unlimited access to select Vail Resorts properties and a limited number of days at Vail Resorts' most popular destinations like Vail ski resort. The "Epic Day Pass" is a customizable one-to-seven-day pass product purchased in advance of the season.

72.    Vail Resorts starts selling the various Epic Passes in the spring preceding the ski season (*i.e.,* passes for the 2025-26 ski season went on sale in March 2025). Vail Resorts offers skiers the lowest price for its Passes in the spring—prices go up in the summer and fall.

73.    Vail Resorts stops selling its various pass products—including the Epic Day Pass—in late November-Early December before the ski season begins in earnest, which for most ski areas is around the Christmas-New Year's winter break. Therefore, skiers must lock themselves into skiing at Vail Resorts' ski areas months before the ski season starts if they want to avoid missing out on the Epic Pass opportunity altogether. Commentators have noted that Vail Resorts' "central strategy" has been to "drive more and more skiers towards the 'subscription model' of locking into an Epic season pass more than half a year ahead of the next season."[15]

---

[15] Zach Armstrong, "Vail Resorts CEO Rob Katz Shifts Focus To Day Lift Tickets For 2025-26 Season," *Snow Brains* (Oct. 16, 2025), *available at* https://snowbrains.com/vail-resorts-ceo-rob-katz-shifts-focus-to-day-lift-tickets-for-2025-26-season/.

74.     In its inaugural season, skiers paid $579 for an Epic Pass to visit the Colorado ski areas Vail, Breckenridge, Beaver Creek, and Keystone as many times as they wanted, as well as Heavenly ski resort in Lake Tahoe.

75.     Since 2008, Epic Pass prices have steadily increased. Below is a chart tracking the spring price of the Epic Pass and the Epic Local Pass since the 2021-2022 ski season. Since the 2021-22 season, the Epic Pass has increased by 37%, from $793 to $1,089:

**Figure 7.**

| Ski Season | Epic Pass Spring Price | Epic Local Pass Spring Price |
|---|---|---|
| 2021-2022 | $793 | $583 |
| 2022-2023 | $841 | $626 |
| 2023-2024 | $909 | $676 |
| 2024-2025 | $982 | $731 |
| 2025-2026 | $1,052 | $783 |
| 2026-2027 | $1,089 | $809 |

76.     The Epic Passes are a crucial segment of Vail Resorts' revenues. For instance, between 2018 and 2024, pass revenues rose from 47% to 65% of the company's lift revenue.

31

**Figure 8.**[16]

| Revenue (FYE July, US$ mn) | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | CAGR 18-24 |
|---|---|---|---|---|---|---|---|---|
| **Mountain Lift Revenue Breakup** | | | | | | | | |
| Pass Mountain Lift Revenue | 414 | 486 | 466 | 657 | 799 | 867 | 938 | 14.6% |
| Non - Pass Mountain Lift Revenue | 467 | 548 | 447 | 420 | 511 | 554 | 505 | 1.3% |
| **Pass Revenue Share of Mountain Lift Revenue (%)** | **47%** | **47%** | **51%** | **61%** | **61%** | **61%** | **65%** | |

77.     For Fiscal Year 2025, Vail Resorts' various Epic Passes "generated approximately 65% of . . . total lift revenue and approximately 75% of total visitation."[17]

78.     In addition to unlimited, unrestricted access to the Vail Resorts-owned ski areas, Epic Pass holders also receive a set number of days, typically five to seven, at designated partner ski areas in North America and abroad. These partner resorts are not owned by Vail Resorts but participate in the Epic Pass ecosystem through contractual arrangements that extend the reach and perceived value of the pass.

### 4.  Alterra Follows Vail Resorts' Business Model

79.     Alterra Mountain Company was created when affiliates of KSL Capital Partners, owner of the Lake Tahoe ski resort now known as Palisades Tahoe, and Henry Crown and Company purchased Intrawest, Mammoth Resorts, and Deer Valley Resort in 2017 through a joint venture. Alterra is a privately held company.

80.     Since its founding, Alterra has followed Vail Resorts' playbook by (a) acquiring Destination Ski Resorts and Regional Ski Areas across North America, and

---

[16] MileHighMonk, "Vail Resorts $MTN," *Substack* (Jan. 17, 2025), *available at* https://milehighmonk.substack.com/p/vail-resorts-mtn

[17] Vail Resorts, Inc. Form 10-K (2025) at 5.

(b) introducing its own Mega Pass that grants access to dozens of Destination Ski Resorts and Regional Ski Areas.

81.    Like Vail Resorts, Alterra owns and/or operates several of the most visited and recognized Destination Ski Resorts in North America, including Steamboat, Winter Park, Deer Valley, Palisades Tahoe, and Mammoth Mountain.

82.    Indeed, controlling access to marquee Destination Ski Resorts across North America has been the core of Alterra's business model since its inception. As *The Denver Post* reported when Alterra launched the Ikon Pass in 2018, the company was created by "***corralling a dozen top-tier destination ski resorts***" and immediately leveraged those assets to introduce a pass offering "a blend of limited and unlimited skiing on 50,000 acres across 23 resorts in nine states and three Canadian provinces." The Ikon Pass prominently featured "coveted resorts such as Aspen Snowmass … Wyoming's Jackson Hole Mountain and Utah's Alta and Snowbird"—resorts widely regarded as top Destination Ski Resorts.[18]

83.    As of 2025, Alterra owns and/or operates 16 ski areas, including both Destination Ski Resorts and Regional Ski Areas. Figure 9 below identifies all of Alterra's ski areas, including information about when the properties were acquired and where they are located.

---

[18] Jason Blevins, "New ski pass aims to rival the Epic Pass with access to 23 resorts," *The Denver Post* (January 25, 2018), *available at* https://www.denverpost.com/2018/01/25/alterra-mountain-co-ikon-pass/

**Figure 9: Alterra Acquisition History**

| Resort | Location | Acquisition Year |
| --- | --- | --- |
| Palisades Tahoe | California | - |
| Blue Mountain | Ontario | 2017 |
| Snowshoe | West Virginia | 2017 |
| Steamboat | Colorado | 2017 |
| Stratton | Vermont | 2017 |
| Tremblant | Quebec | 2017 |
| Winter Park | Colorado | 2017 (operated by Alterra; owned by the City of Denver) |
| Big Bear Mountain Resort | California | 2017 (merged with Snow Summit; in 2023 Snow Valley merged with Big Bear/Snow Summit) |
| June Mountain | California | 2017 |
| Mammoth Mountain | California | 2017 |
| Deer Valley | Utah | 2017 |
| Solitude | Utah | 2018 |
| Crystal Mountain | Washington | 2018 |
| Sugarbush | Vermont | 2019 |
| Schweitzer | Idaho | 2023 |
| Arapahoe Basin | Colorado | 2024 |

84.    Since 2018, Alterra has sold the Ikon Pass, a Mega Pass that gives passholders unlimited and unrestricted access to 18 resorts—including most of the Alterra-owned resorts listed above—in addition to a limited number of days at about 50 other resorts, including renowned Destination Ski Resorts like Jackson Hole and Aspen Snowmass.

85.    Like the Epic Pass, the Ikon Pass offers unlimited or limited access to both Destination Ski Areas and Regional Ski Areas throughout North America.

86.    In addition to the flagship Ikon Pass, Alterra offers less expensive passes with more restrictions. The "Ikon Base Pass" provides limited access to select ski areas included on the full Ikon Pass and has blackout dates. The "Ikon Session Pass" is a customizable two-to-four-day pass product purchased in advance of the season.

87.    Like Vail Resorts, Alterra starts selling the Ikon Pass in the spring preceding the ski season (*i.e.,* passes for the 2025/2026 ski season went on sale in March 2025). Alterra offers skiers the best price for its passes in the spring—prices go up in the summer and fall.

88.    Alterra stops selling its various pass products—including the Ikon Session Pass—around the same time Vail Resorts stops selling it passes, prior to the Christmas-New Years winter break.

89.    In its inaugural season in 2018, skiers paid $899 for an Ikon Pass. Since then, Alterra has steadily increased prices for both the full Ikon Pass and the Ikon Base Pass. Below is a chart tracking the spring price of the Ikon Pass and the Ikon Base

35

Pass since the 2021-2022 ski season. Since the 2021-22 season, Alterra has raised the price of its Ikon Pass by 40%, from $999 to $1,399:

**Figure 10.**

| Ski Season | Ikon Pass Spring Price | Ikon Base Pass Spring Price |
|---|---|---|
| 2021-2022 | $999 | $729 |
| 2022-2023 | $1,079 | $769 |
| 2023-2024 | $1,159 | $829 |
| 2024-2025 | $1,249 | $869 |
| 2025-2026 | $1,329 | $909 |
| 2026-2027 | $1,399 | $949 |

90.     Ikon Pass members also receive access to a broad portfolio of partner resorts in North America and abroad (generally up to five or seven days per season but unlimited days at select properties). These partner resorts are not owned by Alterra but participate in the Ikon Pass ecosystem through contractual arrangements that extend the reach and perceived value of the pass. There are no partner resorts that are included on both Mega Passes.

91.     Alterra and many of its American partner resorts all use the same technology platform called Aspenware for all mountain-related commerce, including Lift Tickets, retail, dining, and lodging.

92.     In 2022, Alterra and Aspen Skiing Company acquired Aspenware. At the time, Aspenware processed 2 million transactions annually for clients such as Alterra, Aspen Skiing Company, Boyne Resorts, Powdr Corporation, and Jackson Hole Mountain Resort—all owners of ski areas that accept the Ikon Pass. Upon information

and belief, Aspenware allows Alterra and its partners to price Lift Tickets consistently throughout the Ikon Pass ecosystem.

93.    For the 2025–26 season, Alterra expanded its partner portfolio through the Ikon Pass "Bonus Mountain" program, which incentivizes independent resorts to join the Ikon network on a more limited basis. Under this program, participating resorts agree to provide Ikon Pass holders with two days of lift access at their mountains. In exchange, those resorts gain access to Ikon's large customer base and are permitted to offer their own season pass holders the opportunity to purchase discounted three-day passes from Alterra.

94.    For the 2025–26 season, Ikon Pass holders received two "bonus" days of lift access at the following ski areas:

**Figure 11. Ikon "Bonus Mountains" for the 2025–26 season.**

| Resort | Location |
|---|---|
| **Buck Hill Ski & Snowboard Area** | Minnesota, USA |
| **Cranmore Mountain Resort** | New Hampshire, USA |
| **Grouse Mountain** | British Columbia, Canada |
| **Jiminy Peak Mountain Resort** | Massachusetts, USA |
| **SilverStar Mountain Resort** | British Columbia, Canada |
| **Ski Butternut** | Massachusetts, USA |
| **Wild Mountain** | Minnesota, USA |

95.    For the 2026-27 season, Alterra is expanding the Bonus Mountain program with two additional ski areas.

### 5.  The Prices of Daily Lift Tickets Have Skyrocketed

96.    Following the introduction of the Defendants' Mega Passes, the prices of Lift Tickets have climbed sharply. This is no accident; Defendants price their Lift Tickets in a way to induce (or coerce) customers into buying the Mega Pass bundle. While the ultimate price of a Lift Ticket is dependent on the day for which the skier is purchasing a ticket (holidays and weekends are more expensive than weekdays, for instance), the prices of Lift Tickets across the board have increased dramatically.

97.    Lift Tickets can be purchased online or in-person at a ski area anytime during the ski season. Both Destination Ski Resorts and Regional Ski Areas offer Lift Tickets.

98.    Compared to Mega Passes, which must be purchased in advance of the ski season, Lift Tickets offer more flexibility, albeit at a higher per day price. By forgoing a Mega Pass, a skier or snowboarder can choose to buy a Lift Ticket for any ski area, regardless of pass affiliation. This allows them to go to the ski area with the best conditions and most open terrain, for instance, whenever they want. Additionally, there is no large, upfront payment required.

99.    Unfortunately, purchasing Lift Tickets has become cost prohibitive for many skiers. Nationally, the average window rate at big resorts has more than *doubled* since the mid-2000s. As shown in the Figure below, a 2018 study found that between

2000-2017, the effective ticket price for Vail Resorts' ski resorts has significantly outpaced inflation, especially when excluding pass holders.

**Figure 12.[19]**



100.    Since 2018, the prices of Lift Tickets at Defendants' Destination Resorts have continued to significantly outpace inflation.

---

[19] *US Ski Resort Pricing and Volumes: Downhill Racing* (January 2018).

**Figure 13.[20]**



101.    Below are daily Lift Ticket prices for various Destination Ski Resorts in Colorado affiliated with either the Epic Pass or Ikon Pass during the 2019 and 2025 holiday periods (December 21-January 5):

---

[20] Andrew Ross Sorkin, *et al.*, DealBook Newsletter, *The New York Times* (December 12, 2025), *available at* https://www.nytimes.com/2025/12/12/business/dealbook/ellison-paramount-oracle-warner-bros-financing.html

**Figure 14.**

| Ski Area (pass affiliation) | Lift Ticket Price 2019 | Lift Ticket Price 2025 |
|---|---|---|
| Vail Mountain (Epic Pass) | $219 | $356 |
| Beaver Creek (Epic Pass) | $189 | $356 |
| Breckenridge (Epic Pass) | $173 | $321 |
| Steamboat (Ikon Pass) | $159 | $339 |
| Winter Park (Ikon Pass) | $149 | $279 |

102.    Outside Colorado, Lift Ticket prices at Destination Ski Resorts have risen to similar prices. For instance, at Park City in Utah, which is included on the Epic Pass, a single day Lift Ticket was $385 with tax during the 2025 holiday period. At Deer Valley in Utah, which is included on the Ikon Pass, a single day Lift Ticket was $382 with tax during the same period.

103.    Lift Tickets at Regional Ski Areas have also become incredibly expensive. For instance, a peak-priced Lift Ticket purchased at Stowe, a Regional Ski Area located in Vermont and included on the Epic Pass, costs $250. A peak priced Lift Ticket purchased at nearby Sugarbush, a Regional Ski Area included on the Ikon Pass, costs $195.

**C.    Anticompetitive Conduct**

104.    During the Class Period, Defendants have engaged in an identical anticompetitive scheme to raise the costs of Lift Tickets and Mega Passes to the detriment of Plaintiffs and members of the Class. Specifically, through the Epic Pass and Ikon Pass, Defendants use the market power they each have in the market for Destination Ski Resorts to restrain competition in the market for Regional Ski Areas by

bundling access to Destination Ski Resorts to access to Regional Ski Areas. These anticompetitive bundles have raised costs and reduced quality for all skiers and snowboarders regardless of whether they purchase a Lift Ticket or Mega Pass.

### 1. Anticompetitive Bundling

105. The Mega Passes offered by Vail Resorts and Alterra function as an anticompetitive tie-in, or bundle, under the antitrust laws.

106. A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product. Tying arrangements include instances of discount bundling, such as when a seller does not literally require the customer to buy two or more products together, but economically coerces that result by (for instance) charging a supracompetitive penalty price for the individual products compared to the price of the bundle.

107. With bundling schemes, as a subset or alternate form of an anticompetitive tying arrangement, there must be both a "tying product market" and a "tied product market."

108. Here, (1) the tying product market is the market for lift access to Destination Ski Resorts; and (2) the tied product market is the market for lift access to Regional Ski Areas.

#### a. Tying and Tied Markets

109. *Lift access is a distinct product.* The relevant product at issue is lift access, including access sold as single-day lift tickets and multi-mountain passes. Lift access is the essential input required for skiing and snowboarding at a ski area; without

42

purchasing lift access (whether through a day ticket or pass), consumers cannot access a resort's lifts and terrain.

110.    ***Destination Ski Resort Lift Access and Regional Ski Area Lift Access are economically distinct product markets.*** The relevant product markets include at least two economically distinct lift access products: (1) lift access to Destination Ski Resorts; and (2) lift access to Regional Ski Areas.

111.    As Vail Resorts has explained, Destination Ski Resorts "generally receive[] a meaningful portion of skier visits from long distance travelers," while Regional Ski Areas "tend[] to generate skier visits predominantly from [their] respective local market[]."[21]

112.    Additionally, Destination Ski Resorts are large, marquee resorts with expansive terrain, extensive lift infrastructure, destination amenities, and national reputations that attract travelers across state or country lines. Destination Ski Resorts include only those resorts considered by the NSAA as an "Extra-Large" ski mountain. Demand for these resorts is driven by their quality, scarcity, and prestige. Consumers frequently plan trips to Destination Ski resorts and purchase access tickets or passes months in advance.

113.    In contrast, Regional Ski Areas primarily serve local and regional skiers and compete largely on proximity, convenience, and affordability. Regional Ski Areas

---

[21] Vail Resorts, Inc. Form 10-K (2025) at 5.

43

are generally smaller than Destination Ski Areas and are typically selected for day trips or weekend skiing. They compete most directly with other nearby regional alternatives.

114.    Lift access to Destination Ski Resorts is not reasonably interchangeable with lift access to Regional Ski Areas from the consumer's perspective. A skier seeking a destination trip to a marquee resort in the Rockies cannot reasonably substitute a small local hill in the Mid-Atlantic in response to a small but significant non transitory price increase. Conversely, a local skier deciding where to ski on the weekend generally cannot substitute a distant destination resort due to travel time and cost. While some Destination Ski Resorts may also attract regional skiers and some Regional Ski Areas may occasionally attract travelers, these edge cases do not undermine the economic distinction between the two markets, which is driven by typical consumer behavior, planning horizons, and substitution patterns.

115.    ***Relevant Geographic Markets for the Relevant Product Markets.*** The relevant geographic market for Destination Ski Resort lift access is North America. Destination Ski Resorts compete for travelers across state lines and across the border between the United States and Canada. Defendants market and sell access to Destination Ski Resorts across North America through their Mega Passes.

116.    Alternatively, the relevant geographic market for Destination Ski Resort lift access is the United States. Roughly 97% of skiers at U.S. mountains are U.S. citizens.

117.    Destination Ski Resorts outside of North America are not reasonably interchangeable with North American Destination Ski Resorts due to geographic

44

distance, price, and overall greater complexities in travel arrangements. Only a small percentage of American skiers travel outside of North America for skiing.

118.    The fact that Defendants sell Mega Passes that include access to ski areas in multiple countries does not establish that those properties are reasonably interchangeable from the consumer's perspective. The relevant geographic market is determined by where consumers can practicably turn in response to a price increase for lift access—not by the geographic scope of a bundled product sold by a dominant firm. A North American skier cannot reasonably substitute lift access at a ski resort in Europe or Japan in response to a price increase at a North American Destination Ski Resort due to travel time, cost, and logistical barriers.

119.    The relevant geographic markets for Regional Ski Area lift access are local or regional, typically defined by reasonable driving distance from population centers, taking into account travel time, transportation costs, and the feasibility of same-day or weekend trips. Regional Ski Areas compete primarily with other nearby ski areas for local skiers.

120.    To the extent Defendants contend broader or narrower geographic markets are appropriate, Plaintiffs plead the foregoing markets in the alternative and will establish the precise contours of relevant markets through discovery and expert analysis.

### b. The Mega Passes Bundle Destination Ski Resort Lift Access and Regional Ski Area Lift Access into All-or-Nothing Season Pass Products

121. At the core of both Defendants' businesses are sales of their Mega Passes. Vail Resorts' Epic Pass provides passholders access to Vail Resorts' extensive network of resorts plus partner resorts; Alterra's Ikon Pass provides access to Alterra-owned resorts plus partner resorts.

122. Both Mega Passes can be viewed as bundles of individual, day-access lift tickets. But more important with respect to the allegations herein, the Mega Passes also combine lift access to Destination Ski Resorts with lift access to Regional Ski Areas. Consumers cannot purchase the core value proposition of these products—reasonable access to highly desirable Destination Ski Resorts—without also purchasing bundled access to many Regional Ski Areas included in the same Mega Pass ecosystem, even if they do not live anywhere close to these Regional Ski Areas.

### c. Defendants Use Supracompetitive Lift Ticket Prices to Coerce Consumers into the Mega Pass Bundles

123. The Mega Pass products are not simply good deals that reward repeat visits to Vail Resorts' or Alterra's ski areas; they are an important part of Defendants' overarching coercive pricing structures. Defendants charge extremely high single-day Lift Ticket prices at Destination Ski Resorts—prices that make purchasing lift access outside the Mega Pass ecosystem appear, at least on its face, as economically irrational for many consumers. Put another way, the inflated Lift Ticket prices act as a punitive outside option, or "penalty price," for buying the tickets individually, effectively

46

coercing consumers into buying the even more expensive Mega Passes by making à la carte Lift Ticket purchases prohibitively expensive on their own.

124. For example, for the 2025–2026 season, single day Lift Tickets at Vail Ski Resort could cost as much as $356, and single day Lift Tickets at Alterra's Steamboat could cost as much as $339.

125. There have also been sharp increases in peak-period day-ticket pricing over time at major Colorado Destination Ski Resorts. For example, during the holiday period (December 21–January 5) in each of the years 2019 to 2025, Lift Ticket prices increased materially at multiple Epic and Ikon Destination Ski Resorts, including Vail, Beaver Creek, Breckenridge, Steamboat, and Winter Park.

126. Vail Resorts' current CEO Rob Katz confirmed that this coercion has been a deliberate pricing strategy. Katz told *The New York Times* that "**Vail's lift-ticket prices have been 'intentionally' aggressive . . . They pushed customers to buy Epic Passes**, the all-access season pass that Vail introduced in 2008 and which are sold before the winter season."[22]

127. In addition, Defendants structure the timing of their sales offerings to ratchet up the coercion. Both Defendants begin marketing next-season Mega Passes six months before the season opens and cut off sales of the Mega Passes before the peak of the season. This puts skiers in an even greater bind. If customers fail to buy the

---

[22] Andrew Ross Sorkin, *et al.*, DealBook Newsletter, *The New York Times* (December 12, 2025), *available at* https://www.nytimes.com/2025/12/12/business/dealbook/ellison-paramount-oracle-warner-bros-financing.html

Epic Pass or Ikon Pass in the spring or summer—when their ski-season plans may be completely unplanned and major factors such as ease of winter travel and snowfall equally up in the air—they may miss out on their only opportunity to buy the Mega Pass for the length of the season. They may even miss out on entire days of skiing at their chosen ski areas altogether, given that Lift Tickets may be sold out for certain peak times. Thus, both the Mega Pass pricing and its marketing encourage consumers to commit months in advance, and to plan their entire ski seasons around the Epic or Ikon network, amplifying lock-in and foreclosure effects.

### d. The Mega Pass Bundles Function Through Penalty Pricing That Forecloses Rivals

128.    Defendants' Mega Passes both operate through a penalty-pricing structure that not only induces skier loyalty but essentially forces it. Once consumers purchase a Mega Pass, the marginal price of skiing additional days within the Epic or Ikon ecosystem is low (or zero), giving consumers' strong incentives to ski only Epic or Ikon affiliated ski areas rather than independent alternatives. In short, Mega Passes are *so* expensive, financially rewarding only the *strictest* commitment, and therefore work as a trap. A reasonable skier, having purchased the bundle, would be fully justified in feeling that any additional dollar that he or she may want to spend at a competing ski area that is not covered by the Mega Pass is wasted.

129.    This is especially true for Regional Ski Areas, which are far more diverse in their ownership than Destination Ski Resorts. A consumer who has not committed to either Mega Pass and wishes to ski Regional Ski Areas likely has several options nearby, and hundreds across North America. But a consumer who has already

48

committed to an Epic or Ikon Mega Pass is incentivized to ski what they already paid for at Defendants' regional affiliates, diverting skier visits away from independent local resorts for the entire season.

130. Independent Regional Ski Areas cannot replicate Defendants' bundles because, unlike Vail Resorts and Alterra, they do not own or have partnerships with the "must have" Destination Ski Resorts that anchor the Mega Passes. As a result, independents must compete not only against a nearby Epic/Ikon Regional Ski Area, but against the combined value of a nationwide destination portfolio plus local access—all sold in one bundle. Even the Indy Pass—a Mega Pass giving pass holders access to dozens of independent ski areas not on the Epic or Ikon Pass—is not a substitute, as the Indy Pass only gives pass holders two days of access at each ski area on the pass and does not provide access to any Destination Ski Resorts.

131. For example, Smugglers' Notch, an independent Regional Ski Area located in Vermont, offers a much lower peak daily lift ticket price than nearby Epic/Ikon Regional Ski Areas (Stowe and Sugarbush, respectively), yet the Mega Pass structure pressures consumers to commit to only going to Epic or Ikon resorts and, thereby, diverting regional traffic away from less expensive independents like Smuggler's Notch.

132. Independent regional resorts must discount aggressively to compensate consumers for the opportunity cost of skiing outside the Epic/Ikon ecosystem after purchasing a Mega Pass. Such discounting is likely unsustainable in the long term.

133. Ultimately, independent ski areas face a stark choice: join Defendants' Mega Passes (through acquisition or partnership) or face potential closure.

### e. Defendants' Market Power over Destination Ski Resorts Enables the Foreclosure

134.    Defendants have sufficient economic power in the market for Destination Ski Resort lift access in North America to force and maintain this bundling scheme. The percentage of properties in that market that are outright owned by Vail Resorts and Alterra individually, while not public, is unquestionably high. Moreover, nearly every Destination Ski Resort in North America is included on either the Epic Pass or the Ikon Pass, leaving consumers with few, if any, meaningful substitutes for Destination Ski Resort lift access outside Defendants' networks.

135.    While public data currently available is insufficient to determine with precision each Defendant's share of the market for Destination Ski Resort access, it can be approximated.

136.    Market share in the ski industry is commonly measured by skier visits. Although Destination Ski Resorts do not publicly disclose annual skier visits for each mountain—Vail Resorts has not reported per-mountain skier visits since the 2010–11 ski season, asserting that such information is proprietary—the data that is available demonstrates the scale and concentration of demand at marquee resorts.

137.    As shown above in **Figure 2**, nearly all ski areas classified by the NSAA as "Extra-Large" are affiliated with either the Epic Pass or the Ikon Pass. According to the NSAA, the 31 mountains in the Extra-Large category accounted for approximately 26,447,526 skier visits in the 2023–24 ski season, and the 33 Extra-Large mountains accounted for approximately 28,569,321 skier visits in the 2022–23 ski season. Because the Extra-Large category includes only a small number of ski areas

50

nationwide, yet accounts for tens of millions of skier visits annually, the data demonstrates that a disproportionate share of skier demand is concentrated at this small group of marquee resorts.

138.   Within this concentrated universe of Extra-Large Destination Ski Resorts, Defendants' owned-and-operated properties account for a substantial portion of total skier visits. The NSAA provides its members, including Vail Resorts and Alterra, with skier visit rankings. Vail Resorts owns five of the ten most visited ski resorts in the United States—Vail, Breckenridge, Park City, Keystone, and Beaver Creek—which together generated approximately 6.25 million skier visits when last publicly reported for the 2010–11 ski season. Alterra owns several other top-ranked Destination Ski Resorts—including Palisades Tahoe, Deer Valley, Mammoth, and Steamboat—which collectively account for millions of additional skier visits annually. Even excluding affiliated partner resorts, Defendants' directly-owned Destination Ski Resorts comprise a dominant share of skier visits among the most heavily trafficked Destination Ski Resorts in the United States.

139.   Thus, based on available data, Defendants' owned-and-operated Destination Ski Resorts account for a dominant share of skier visits at marquee Destination Ski Resorts, well in excess of thresholds traditionally associated with market power.

140.   Furthermore, both Vail Resorts and Alterra have partnerships with the few other Destination Ski Resorts in North America that they do not own or operate and offer access to those resorts on their respective Mega Passes. When factoring in these

resorts, Vail Resorts and Alterra grant access to all or nearly all Destination Ski Resorts in North America, thereby foreclosing meaningful access to Destination Ski Resort lift access outside Defendants' Mega Pass ecosystems.

141.    Vail Resorts' own characterization of its "major destination" competitors underscores this point. For instance, in its most recent 10k, Vail Resorts identified other "major destination mountain resorts" that putatively compete with Vail's Destination Ski Resorts. Every single North American resort Vail identified is affiliated with the Ikon Pass: "Our resorts compete with other major destination mountain resorts, including, among others, Aspen Snowmass, Deer Valley, Jackson Hole, Copper Mountain, Steamboat, Winter Park, Snowbird, Palisades Tahoe, Killington, Mammoth."[23]

142.    In states that dominate the Destination Ski Resort market, Defendants' Mega Passes cover the majority of lift capacity, a proxy for market dominance. "In Colorado, 86 percent of capacity is Ikon/Epic. In California, 66 percent of lifts are Ikon/Epic. In Utah, 74 percent of lifts are Ikon/Epic."[24]

143.    Although Defendants may compete with one another at the margins for certain customers, that limited rivalry does not discipline the anticompetitive conduct alleged here. Competition between two functionally identical (anticompetitive) bundles does not cure the coercion inherent in the tying arrangement, because consumers are

---

[23] Vail Resorts, Inc. Form 10-K (2025) at 7.

[24] Travis Swiger and Adam Looney, "Increasing Concentration in the Era of Epic and Ikon – Are Skiers and Boarders Better or Worse Off?," *Marriner S. Eccles Institute for Economics and Quantitative Analysis: The University of Utah*, *available at* https://marriner.eccles.utah.edu/increasing-concentration-in-the-era-of-epic-and-ikon-are-skiers-and-boarders-better-or-worse-off/

still forced to accept the tied product to obtain the tying product. Critically, Vail Resorts and Alterra do not compete on the *structure* of their Mega Pass products. Instead, both Defendants employ the same exclusionary tying and bundling model: conditioning reasonably priced access to must-have Destination Ski Resorts on the purchase of all-or-nothing season passes that also bundle lift access to numerous Regional Ski Areas. At no point have Defendants meaningfully diverged from this model by offering unbundled destination access, modular pricing, or destination-only passes that would permit consumers to avoid the tied products. Thus, whatever putative competition exists between Defendants does not operate to constrain the tying arrangement itself, which is the source of the anticompetitive harm.

144.    Indeed, the evolution of the Mega Passes provides a natural experiment demonstrating that inter-brand competition has failed to discipline Defendants' conduct. Vail Resorts introduced the Epic Pass first and established the bundled Mega Pass model. Alterra, upon entering the market, had the opportunity and economic incentive to compete by offering a materially different product, such as unbundled destination access, lower Lift Ticket prices, or less coercive terms, in order to take share from Vail Resorts. Alterra instead chose to mimic Vail Resorts' bundling and pricing strategies, sales calendar, and exclusionary structure. This parallel adoption of the same bundling scheme confirms that Defendants' competition does not constrain pricing or product design in the relevant markets but instead results in the preservation and entrenchment of supracompetitive pricing and foreclosure across both Defendants' Mega Pass ecosystems.

### f. *Anticompetitive Effects: Higher Prices, Reduced Choice, and Degraded Quality*

145.   Defendants' Mega Pass bundling scheme has resulted in higher prices and reduced choice for consumers. Defendants profit by steering consumers into high-upfront-cost Mega Pass bundles while simultaneously charging supracompetitive Lift Ticket prices to consumers who do not purchase Mega Passes.

146.   The bundle also distorts consumer demand by creating a powerful "sunk cost" incentive: once consumers purchase an Epic or Ikon product, the marginal cost of skiing within Defendants' networks is low (or zero), while skiing outside those networks requires an additional out-of-pocket payment, regardless of price, quality, or conditions at competing resorts.

147.   The scheme disproportionately harms: (a) casual and lower-frequency skiers, who face either prohibitively high prices for Lift Tickets or large upfront Mega Pass costs, and (b) local skiers, who lose meaningful choice about where to ski because the Mega Pass structure channels demand toward Defendants' affiliated resorts and causes the Lift Tickets for those local skiers to be higher. Purchasers of the Mega Passes, even those who would have bought a Mega Pass no matter what its price or the incentives surrounding it, also incur an overcharge, as the bundled price is inflated by virtue of Defendants' pricing of the Lift Tickets.

148.   As Mega Pass purchases have grown, Destination Ski Resorts included in Defendants' networks have become notoriously crowded, with long lift lines and congested terrain. Plaintiffs plead these crowding conditions not merely as a consumer inconvenience, but as evidence of distorted demand and degraded quality resulting

54

from Defendants' bundling strategy. The bundle incentivizes passholders to concentrate visitation at Epic- and Ikon-affiliated ski areas, especially on peak-priced days, because the marginal price of additional ski days within the bundle is effectively zero.

149. A widely publicized photograph from Vail Ski Resort taken in February 2020, popularly dubbed "lift line apocalypse," is illustrative of the crowding effects associated with Mega Pass-driven visitation.

**Figure 15.** [25]



150. Crowding and operational issues at Park City (owned by Vail Resorts) were widely publicized in December 2024 when the ski area attempted to stay open while its ski patrol went on strike. The Park City Professional Ski Patrol Association cited bad-faith bargaining and violations of the National Labor Relations Act by Vail Resorts as reasons for the strike.

---

[25] "Vail's 'lift line apocalypse'-and the new ski resort with a radical solution," *Financial Times*, *available at* https://www.ft.com/content/ae560476-4d83-11ea-95a0-43d18ec715f5

**Figure 16.**[26]



151.    Similar crowding complaints are made about Alterra's resorts, including at Winter Park, as reflected in the screenshot reproduced below.

---

[26] "Lift, picket, and powder lines bring challenges to Park City Mountain," *Town Lift* (Dec. 27, 2024), *available at* https://townlift.com/2024/12/lift-picket-and-powder-lines-converge-at-park-city-mountain/

**Figure 17.[27]**



152.     The experience of Arapahoe Basin ski area in Colorado further

demonstrates how Defendants' Mega Passes distort demand and channel skier visits.

Arapahoe Basin was a long-standing participant in the Epic Pass, providing unlimited

access to Epic Pass holders. In 2019, the resort left the Epic Pass after publicly citing

overcrowding and capacity constraints caused by unlimited bundled access. Rather

---

[27] "What's the worst lift line in Colorado, and why is it Pano?," *Reddit*, *available at* https://www.reddit.com/r/COsnow/comments/1aomog4/whats_the_worst_lift_in_colorado_and_why_is_it/

than remaining fully independent, Arapahoe Basin subsequently joined the Ikon Pass on a limited-access basis, offering only a capped number of days to Ikon Pass holders in an effort to manage visitation and preserve the guest experience.

153.   Arapahoe Basin's trajectory underscores the coercive effects of Defendants' Mega Pass ecosystems: unlimited bundled access concentrated demand at the resort beyond sustainable levels, yet participation in a competing bundle was still economically necessary. Arapahoe Basin was ultimately purchased by Alterra in 2024 for $105 million. While Alterra limited lift access to Ikon Pass holders to 5-7 days for the 2024-2025 season, for the 2025-2026 season, Alterra offered unlimited access to Arapahoe Basin to Ikon Pass holders.

154.   Arapahoe Basin's progression—from unlimited Epic access, to limited Ikon participation, to full acquisition by Alterra with full Ikon access—illustrates how independent ski areas that attempt to resist or moderate the effects of Mega Pass-driven demand are nonetheless drawn into one of the two dominant pass networks, further reducing independent competitive alternatives.

155.   Consumers likewise report that Mega Pass bundling has reduced meaningful choice and locked skiers into Defendants' networks for an entire season. For example, a snowboarder from Lake Tahoe complained online that he misses "the days before Epic/Ikon when we'd choose where to ride based on which resorts had the best conditions that morning. Now everyone's largely locked in based on their pass."[28]

---

[28] "1500$ for a pass?" *Reddit*, *available at* https://www.reddit.com/r/snowboarding/comments/1gtjvuj/1500_for_a_pass/

156.    Another snowboarder in the Lake Tahoe area similarly attributed worsening peak-period lines to Mega Pass-driven demand concentration, stating: "I cannot get over what the lines are like now . . . I literally cannot ride weekends anymore *especially* with the current state of season pass crowds."[29]

157.    The Mega Pass bundling scheme also harms independent resorts by foreclosing a substantial portion of demand in the tied market for Regional Ski Area lift access. Independent Regional Ski Areas must compete not only against a nearby Epic- or Ikon-affiliated Regional Ski Area, but against the sunk-cost incentives created by Defendants' Mega Pass bundles that steer skiers to "ski what they already paid for" within Defendants' ecosystems. This foreclosure weakens independent competitors' ability to invest, innovate, and compete on price and quality, thereby reducing consumer choice and entrenching Defendants' market power.

158.    Independent ski areas' efforts to compete on crowd management and affordability underscore the competitive dimensions suppressed by Defendants' scheme.

159.    For example, Vermont's Magic Mountain—an independent Regional Ski Area located in Southern Vermont near Vail Resorts-owned Okemo and Mount Snow and Alterra-owned Stratton—offers comparatively low lift ticket prices and explicitly positions itself as an alternative to the congestion associated with the Mega Pass model. On its website, Magic Mountain says: "At Magic, we keep our regular everyday

---

[29] *Id.*

online ticket prices as low as possible (and consistently lower than any mountain in Vermont with 1,500 vertical feet of skiing)." It prominently advertises online that it has "LESS CROWDS."

**Figure 18.**



160.    Similarly, skiers online commend Smugglers' Notch—another independent Regional Ski Area located in Northern Vermont near Vail Resorts-owned Stowe and Alterra-owned Sugarbush—for its low crowds, affordability, conditions.

161.    Locations such as Magic Mountain and Smugglers' Notch may be doing their best to turn low demand into a positive attribute with which to try to compete against the market domination by Vail Resorts and Alterra, along with deep discounting. But the fact that they have been pushed into that position in the first place, as Vail Resorts and Alterra increasingly stretch their market power beyond its natural reach, demonstrates the problem. The crowding and lock-in effects created by the Mega

Passes are economically significant because they reflect diversion of demand away from independent competitors in the tied market for Regional Ski Area lift access. When Mega Pass holders concentrate ski days within Defendants' networks to "get their money's worth," that demand is not available to independent regional resorts that compete on proximity, price, and crowd management.

### g. Antitrust Injury

162.   Plaintiffs and Class members have been injured by Defendants' unlawful bundling scheme in that they paid higher prices for lift access than they would have paid in a competitive market.

163.   This injury includes, among other things, (a) overcharges on Lift Tickets (b) overcharges on Mega Passes; and (c) payments for bundled lift access to tied products (Regional Ski Area lift access) that consumers would not have purchased in a competitive market or would have purchased from independent alternatives absent Defendants' coercive bundling scheme.

164.   Plaintiffs' injuries are of the type that the antitrust laws were intended to prevent and flow directly from Defendants' anticompetitive conduct.

### h. Lack of Procompetitive Justification and Less Restrictive Alternatives

165.   Defendants cannot justify their Mega Pass bundling as reasonably necessary to achieve cognizable efficiencies that outweigh the competitive harm. Any legitimate conveniences or incentives could be achieved through less restrictive alternatives, such as modular or unbundled destination access products, or pricing

structures that do not coerce consumers into season-long, exclusionary commitments before the ski season begins and do not foreclose rivals.

166. Defendants' tying and bundling conduct is unlawful *per se* or, in the alternative, unlawful under a quick look or full rule of reason analysis.

## V. CLASS ALLEGATIONS

167. Plaintiffs bring this action individually and on behalf of all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages, as well as equitable and injunctive relief, on behalf of the following Class:

> All persons in the United States who purchased a Mega Pass or a Lift Ticket for a ski area that is included on a Mega Pass directly from Defendants at any time from March 23, 2022 until Defendants' unlawful conduct and its anticompetitive effects cease to persist ("Class Period").

168. The following persons and entities are excluded from the above-described proposed Class:

- Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

- All governmental entities;

- All Counsel of Record; and

- The Court, Court personnel, and any member of their immediate families.

169. The Class is so numerous as to make joinder impracticable. Plaintiffs do not know the exact number of Class members because such information is presently in the exclusive control of Defendants. Plaintiffs believe that due to the nature of the

industry there are likely millions of Class members in the United States and its territories.

170.    Common questions of law and fact exist as to all members of the Class. Plaintiffs and the Class were injured by the same unlawful scheme, Defendants' identical anticompetitive conduct was generally applicable to all members of the Class, and relief to the Class as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

- Whether Defendants' illegally bundled lift access to Destination Ski Resorts with lift access to Regional Ski Areas;

- The duration of the anticompetitive schemes alleged herein and the acts performed by Defendants in furtherance of those schemes;

- Whether such schemes violated the federal antitrust laws;

- Whether such schemes violated state antitrust or common laws;

- Whether the conduct of Defendants, as alleged in this complaint, caused injury to the Plaintiffs and other members of the Class;

- Whether Defendants caused Plaintiffs and the Class to suffer damages in the form of overcharges on Mega Passes and Lift Tickets;

- The appropriate class-wide measure of damages; and

- The nature of appropriate injunctive relief to restore competition in the ski resort markets described herein.

171.    Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the Class are similarly affected by Defendants' identical unlawful conduct in that they paid artificially inflated prices for Mega Passes and/or Lift Tickets.

172.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

173.    Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

174.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

175.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of

64

the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

176.    Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

177.    Plaintiffs are not bound by any contractual provisions limiting their ability to bring this case as a Class Action. To the extent Defendants claim that any such provisions are relevant to this case, Plaintiffs allege that such provisions are legally unenforceable as to Plaintiffs and members of the Class.

## VI.   CAUSES OF ACTION

## COUNT 1

### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) for Unlawful Bundling against Vail Resorts

178.    Plaintiffs repeat the allegations set forth above, as if fully set forth herein.

179.    Vail Resorts' Epic Pass functions as an anticompetitive bundle, an alternate form of an anticompetitive tying arrangement, under the antitrust laws.

180.    Through the Epic Pass, Vail Resorts ties lift access at its Destination Ski Resorts (the "tying" product) to lift access at its Regional Ski Areas (the "tied" product).

181.    Lift access to Destination Ski Resorts is a separate product from lift access to Regional Ski Areas.

182.    Vail Resorts has sufficient economic power in the market for Destination Ski Resorts and is able to restrain trade in the market for Regional Ski Areas in which it does not have market power.

183.    Vail Resorts sells lift access to Destination Ski Resorts and Regional Ski Areas across North America.

184.    A not insubstantial amount of interstate commerce in the Destination Ski Resorts and Regional Ski Areas markets is affected by Vail Resorts' bundling.

185.    Vail Resorts' bundling practices have anticompetitive effects, namely increased costs for lift access at Destination Ski Resorts and Regional Ski Areas, diminution of competition by independent Regional Ski Areas, reduction of consumer choice, and decreased quality of skiing. Vail Resorts cannot show any cognizable pro-competitive benefits that outweigh the harm to competition and consumers.

186.    Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Vail Resorts to end the ongoing violations alleged herein.

## COUNT 2

### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) for Unlawful Bundling against Alterra

187.    Plaintiffs repeat the allegations set forth above, as if fully set forth herein.

188.    Alterra's Ikon Pass functions as an anticompetitive bundle, an alternate form of an anticompetitive tying arrangement, under the antitrust laws.

189.    Through the Ikon Pass, Alterra ties lift access at its Destination Ski Resorts (the "tying" product) to lift access at its Regional Ski Areas (the "tied" product).

190.    Lift access to Destination Ski Resorts is a separate product from lift access to Regional Ski Areas.

66

191. Alterra has sufficient economic power in the market for Destination Ski Resorts and is able to restrain trade in the market for Regional Ski Areas in which it does not have market power in.

192. Alterra sells lift access to Destination Ski Resorts and Regional Ski Areas across North America.

193. A not insubstantial amount of interstate commerce in the Destination Ski Resorts and Regional Ski Areas markets is affected by Alterra's bundling.

194. Alterra's bundling practices have anticompetitive effects, namely increased costs for lift access at Destination Ski Resorts and Regional Ski Areas, diminution of competition by independent Regional Ski Areas, reduction of consumer choice, and decreased quality of skiing. Alterra cannot show any cognizable pro-competitive benefits that outweigh the harm to competition and consumers.

195. Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Alterra to end the ongoing violations alleged herein.

## COUNT 3

### Violation of Colorado Antitrust Act of 2023 (C.R.S.A. § 6-4-104)
### For Unlawful Bundling against Vail Resorts

196. Plaintiffs repeat the allegations set forth above, as if fully set forth herein.

197. Vail Resorts' Epic Pass functions as an anticompetitive bundle, an alternate form of an anticompetitive tying arrangement, under the antitrust laws.

198. Through the Epic Pass, Vail Resorts ties lift access at its Destination Ski Resorts (the "tying" product) to lift access at its Regional Ski Areas (the "tied" product).

67

199.    Lift access to Destination Ski Resorts is a separate product from lift access to Regional Ski Areas.

200.    Vail Resorts has sufficient economic power in the market for Destination Ski Resorts and is able to restrain trade in the market for Regional Ski Areas in which it does not have market power in.

201.    Vail Resorts sells lift access to Destination Ski Resorts and Regional Ski Areas across North America.

202.    A not insubstantial amount of interstate commerce in the Destination Ski Resorts and Regional Ski Areas markets is affected by Vail Resorts' bundling.

203.    Vail Resorts' bundling practices have anticompetitive effects, namely increased costs for lift access at Destination Ski Resorts and Regional Ski Areas, diminution of competition by independent Regional Ski Areas, reduction of consumer choice, and decreased quality of skiing. Vail Resorts cannot show any cognizable pro-competitive benefits that outweigh the harm to competition and consumers.

204.    Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT 4

### Violation of Colorado Antitrust Act of 2023 (C.R.S.A. § 6-4-104)
### For Unlawful Bundling against Alterra

205.    Plaintiffs repeat the allegations set forth above, as if fully set forth herein.

206.    Alterra's Ikon Pass functions as an anticompetitive bundle, an alternate form of an anticompetitive tying arrangement, under the antitrust laws.

207.    Through the Ikon Pass, Alterra ties lift access at its Destination Ski Resorts (the "tying" product) to lift access at its Regional Ski Areas (the "tied" product).

208.    Lift access to Destination Ski Resorts is a separate product from lift access to Regional Ski Areas.

209.    Alterra has sufficient economic power in the market for Destination Ski Resorts and is able to restrain trade in the market for Regional Ski Areas in which it does not have market power in.

210.    Alterra sells lift access to Destination Ski Resorts and Regional Ski Areas across North America.

211.    A not insubstantial amount of interstate commerce in the Destination Ski Resorts and Regional Ski Areas markets is affected by Alterra's bundling.

212.    Alterra's bundling practices have anticompetitive effects, namely increased costs for lift access at Destination Ski Resorts and Regional Ski Areas, diminution of competition by independent Regional Ski Areas, reduction of consumer choice, and decreased quality of skiing. Alterra cannot show any cognizable pro-competitive benefits that outweigh the harm to competition and consumers.

213.    Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Alterra to end the ongoing violations alleged herein.

## COUNT 5

### Unjust Enrichment against Defendants

214.    Plaintiffs repeat the allegations set forth above, as if fully set forth herein.

69

215.    Plaintiffs and Class members paid higher prices for lift access at Defendants' ski resorts than what would have otherwise occurred in a market free of Defendants' identical unlawful conduct.

216.    Plaintiffs and Class members conferred a benefit upon Defendants with their money. Specifically, they paid Defendants in order to gain access to their ski areas.

217.    Defendants knew that Plaintiffs and Class members conferred a benefit which Defendants accepted. Defendants profited heavily from these transactions.

218.    Under principles of equity and good conscience, Defendants should not be permitted to retain the money made through these unconscionable acts.

219.    Plaintiffs and Class members have no adequate remedy at law.

220.    Defendants should be compelled to disgorge profits from this unlawful scheme into a common fund or constructive trust, for the benefit of Plaintiffs and Class members. In the alternative, Defendants should be compelled to refund the amounts that Plaintiffs and Class members overpaid for Defendants' services and goods.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully ask this Court for the following:

    A. The Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Lead Class Counsel, and direct that notice of this

action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B. The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof, and be adjudged to have been a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1) (or alternatively illegal under a quick look or rule of reason standard);

C. The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D. The Court grant Plaintiffs and members of the Class all other equitable relief in the nature of divestiture, disgorgement, restitution, and/or the creation of a constructive trust to remedy Defendants' violations of law;

E. The Court enter judgment against Defendants and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained

by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this complaint to the extent provided by law; and

F. The Court award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiffs and members of the Class demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure 38(b).

Dated: March 23, 2026

Respectfully submitted,

*/s/ Jonathan S. Crevier*
Jonathan S. Crevier (CO Bar Number: 62506)
**DICELLO LEVITT LLP**
6645 S Cherry Way
Centennial, Colorado 80121
(646) 933-1000
jcrevier@dicellolevitt.com

Gregory S. Asciolla
Carrie Syme
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
(646) 933-1000
gasciolla@dicellolevitt.com
csyme@dicellolevitt.com

Eric L. Cramer
Michael J. Kane
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19013
(215) 875-3000
ecramer@bergermontague.com
mkane@bergermontague.com

Joshua P. Davis
**BERGER MONTAGUE PC**
505 Montgomery St., Suite 625
San Francisco, CA 94111
(415) 215-0962
jdavis@bergermontague.com

Yaman Salahi
Nicole Cabañez
Taylor Applegate*
**SALAHI PC**
505 Montgomery St., 11th Floor
San Francisco, CA 94111

74

(415) 236-2305
yaman@salahilaw.com
nicolec@salahilaw.com
taylora@salahilaw.com
* Application for admission forthcoming

*Attorneys for Plaintiffs and the Proposed Class*