UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:26-cv-01191-RMR-SBP

LANDIN GOLOJA,
TYLER MAYBEE,
CAITLAN REYNOLDS, and
DANIEL SHEINER, on behalf of
themselves and all others similarly situated,

Plaintiffs,

v.

VAIL RESORTS, INC., and
ALTERRA MOUNTAIN COMPANY,

Defendants.

---

**DEFENDANT ALTERRA MOUNTAIN COMPANY'S MOTION TO DISMISS**

---

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

CERTIFICATE OF CONFERRAL ..... 2

PLAINTIFFS' ALLEGATIONS ..... 2

ARGUMENT ..... 4

I. PLAINTIFFS DO NOT ALLEGE A PLAUSIBLE TYING CLAIM UNDER THE SHERMAN ACT OR THE COLORADO ANTITRUST ACT ..... 4

A. Plaintiffs' Failure to Plead Plausible Relevant Markets Is Fatal to Their Tying Claim under a Per Se or Rule of Reason Analysis ..... 6

1. Plaintiffs' alleged product markets are internally inconsistent, incoherent, and implausible. ..... 7

2. Plaintiffs' alleged geographic markets are either facially implausible or insufficiently defined. ..... 11

B. Plaintiffs Otherwise Have Failed to Allege a Per Se Tying Claim ..... 12

1. Plaintiffs do not plausibly allege that Alterra has market power in the proposed tying product market. ..... 12

2. Plaintiffs do not plausibly allege any "tie" that forces skiers to purchase the tying and tied products together. ..... 16

3. Plaintiffs do not plausibly allege any potential or actual harm to competition in the tied-product market. ..... 19

C. Plaintiffs Have Not Adequately Alleged a Rule of Reason Tying Claim ..... 24

II. PLAINTIFFS' UNJUST ENRICHMENT CLAIM SHOULD ALSO BE DISMISSED ..... 25

CONCLUSION ..... 25

## TABLE OF AUTHORITIES

### CASES

*Abraham v. Intermountain Health Care Inc.*,
461 F.3d 1249 (10th Cir. 2006) .................................................. 5, 20

*Amerinet, Inc. v. Xerox Corp.*,
972 F.2d 1483 (8th Cir. 1992) .................................................. 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................. 4

*Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*,
127 F.4th 178 (10th Cir. 2025).................................................. passim

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................. 4

*Blackmore v. Carlson*,
574 F. Supp. 3d 1012 (D. Utah 2021).................................................. 9

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
140 F.3d 494 (3d Cir. 1998) .................................................. 14

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*,
846 F.3d 1297 (10th Cir. 2017) .................................................. 13, 25

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
532 F.3d 1111 (10th Cir. 2008).................................................. 6, 7

*Cavalleri v. Hermes Int'l*,
No. 24-cv-01707, 2025 WL 2662897
(N.D. Cal. Sept. 17, 2025) .................................................. 6

*Chase Mfg., Inc. v. Johns Manville Corp.*,
84 F.4th 1157 (10th Cir. 2023).................................................. 6, 13, 17, 20

*Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*,
912 F. Supp. 747 (D.N.J. 1995).................................................. 15

*Columbia Plaza Assocs. v. Ne. Univ.*,
227 N.E.3d 999 (Mass. 2024).................................................. 25

*Crocs, Inc. v. Joybees, Inc.*,
No. 21-cv-02859-GPG-SBP, 2024 WL 3580779
(D. Colo. July 12, 2024) .......... 4

*Cuervo v. Sorenson*,
112 F.4th 1307 (10th Cir. 2024) .......... 9

*Dunafon v. Del. McDonald's Corp.*,
691 F. Supp. 1232 (W.D. Mo. 1988) .......... 14

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) .......... 5, 13

*Endure Indus., Inc. v. Vizient Inc.*,
164 F.4th 405 (5th Cir. 2026) .......... 9

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) .......... 23

*Expert Masonry, Inc. v. Boone Cty., Ky.*,
440 F.3d 336 (6th Cir. 2006) .......... 22

*Fox Motors, Inc. v. Mazda Distribs. (Gulf), Inc.*,
806 F.2d 953 (10th Cir. 1986) .......... 17

*HDMI Licensing Adm'r, Inc. v. Availink Inc.*,
No. 22-cv-06947, 2025 WL 3774989
(N.D. Cal. Dec. 31, 2025) .......... 23

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
547 U.S. 28 (2006) .......... 5, 12

*In re Cox Enters., Inc.*,
871 F.3d 1093 (10th Cir. 2017) .......... 5, 20, 21, 22

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
44 F.4th 959 (10th Cir. 2022) .......... 23

*In re Indep. Serv. Orgs. Antitrust Litig.*,
85 F. Supp. 2d 1130 (D. Kan. 2000) .......... 17

*In re Wireless Tele. Antitrust Litig.*,
385 F. Supp. 2d 403 (S.D.N.Y. 2005) .......... 16

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) ........................................passim

*N. Pac. Ry. Co. v. United States*,
356 U.S. 1 (1968) ........................................16

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018) ........................................6, 24

*Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*,
585 F.2d 821 (7th Cir. 1978)........................................20

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
939 F. Supp. 2d 1002 (N.D. Cal. 2013) ........................................12

*Ortho Diagnostic Sys., Inc. v. Abbott Lab'ys, Inc.*,
920 F. Supp. 455 (S.D.N.Y. 1996)........................................18

*Park 80 Hotels, LLC v. Holiday Hospitality Franchising, LLC*,
No. 1:21-cv-04650, 2023 WL 2445437
(N.D. Ga. Feb. 16, 2023) ........................................12

*Phhhoto Inc. v. Meta Platforms, Inc.*,
No. 21-cv-5159, 2026 WL 872963
(E.D.N.Y. Mar. 30, 2026)........................................19

*Ramallo Bros. Printing v. El Dia, Inc.*,
392 F. Supp. 2d 118 (D.P.R. 2005) ........................................18

*Reudy v. Clear Channel Outdoors, Inc.*,
693 F. Supp. 2d 1091 (N.D. Cal. 2010) ........................................15

*S. Pines Chrysler-Plymouth, Inc. v. Chrysler Corp.*,
826 F.2d 1360 (4th Cir. 1987)........................................11

*Sentry Data Sys. Inc. v. CVS Health*,
361 F. Supp. 3d 1279 (S.D. Fla. 2018)........................................12

*Suture Express, Inc. v. Cardinal Health 200, LLC*,
963 F. Supp. 2d 1212 (D. Kan. 2013)........................................21

*Suture Express, Inc. v. Owens & Minor Distrib., Inc.*,
851 F.3d 1029 (10th Cir. 2017)........................................passim

*Tampa Elec. Co. v. Nashville Coal Co.*,
365 U.S. 320 (1961)........................................11

*Telecor Comm'ns, Inc. v. Sw. Bell Tele. Co.*,
305 F.3d 1124 (10th Cir. 2002) .......... 7

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
875 F.2d 1369 (9th Cir. 1989) .......... 7

*Times–Picayune Pub. Co. v. United States*,
345 U.S. 594 (1953) .......... 14

*Ungar v. Dunkin' Donuts of Am., Inc.*,
531 F.2d 1211 (3d Cir. 1976) .......... 20

*Van Zanen v. Qwest Wireless, LLC*,
550 F. Supp. 2d 1261 (D. Colo. 2007) .......... 25

**STATUTES**

15 U.S.C. § 1 .......... 4

C.R.S. § 6-4-104 .......... 4

**RULES**

Civil Practice Standard 10.1 .......... 1

**OTHER AUTHORITIES**

ABA, *Antitrust Law Developments* 189 (8th ed. 2017) .......... 14

Areeda & Hovenkamp,
*Antitrust Law* ¶ 1734e (2d ed. 2004) .......... 16

## INTRODUCTION[1]

Plaintiffs' lawsuit rests on a plainly wrong premise: Alterra somehow forces skiers to purchase multi-mountain passes to ski at individual ski areas. Common sense and the antitrust laws require dismissal of Plaintiffs' claims in their entirety.

The North American ski industry is fiercely competitive. In recent years, over 11.5 million people have skied or snowboarded at nearly 800 different ski areas in the United States and Canada. Alterra owns and operates 16 of these. Alterra offers numerous ticket and pass options for lift access at all of its individual ski areas, including single-use or daily lift tickets for every mountain. It also offers several multi-mountain passes—the Ikon Pass and its various iterations—to consumers who want the flexibility and cost-savings of seasonal or multi-day access to a wide range of ski areas in a single pass. While a relatively small percentage of consumers choose this option, a significantly larger percentage have opted against it in favor of single-use lift tickets, season passes at their mountain(s) of choice, or other multi-mountain passes offered in the industry.

Ignoring this wide array of options—along with the increased optionality inherent in a multi-mountain pass itself—Plaintiffs allege Alterra's Ikon pass products violate federal and state antitrust laws. According to them, by providing more flexibility through multi-mountain access for those skiers who want it, those products act as an anticompetitive tie that somehow forces skiers to purchase multi-mountain passes. That claim defies

[1] Pursuant to Civil Practice Standard 10.1(c)(5), Defendants moved for leave to each file a 25-page motion on June 4, 2026, and that motion was fully briefed by June 5, 2026. (*See* ECF 28, 29, 30.) The Court has not ruled on that motion. Alterra respectfully has filed a 25-page motion. If the Court concludes Alterra should be entitled to fewer pages, Alterra will submit a revised motion in accordance with the Court's directive.

practical reality and the antitrust laws, and the complaint should be dismissed.

Unable to plausibly allege an anticompetitive tie by Alterra itself, Plaintiffs have tried to salvage their claims against Alterra by suing it and Vail together. This is improper. While Plaintiffs lodge similar accusations against Vail, based on its distinct near 20-year practice of selling its own multi-mountain passes, they allege no conspiracy between the two and rely on separate, independent conduct to support their claims against each Defendant. For that reason, each Defendant's practices—and the plausibility of the claims against it—must be judged individually and on their own merits. That means Plaintiffs must plausibly allege—and ultimately prove—their case as to each Defendant.[2] With respect to Alterra, Plaintiffs do not clear that first hurdle.

## CERTIFICATE OF CONFERRAL

Alterra conferred with Plaintiffs regarding the grounds for this motion on May 18, 2026. Plaintiffs chose not to amend their complaint and oppose this motion.

## PLAINTIFFS' ALLEGATIONS

The North American ski industry consists of "nearly 800 lift-served ski areas" in the U.S. and Canada. (ECF 1, Compl. ¶ 36.) Alterra owns and operates 16 ski areas located across seven different states and two provinces in Canada. (*Id.* ¶ 83 & Fig. 9.)

"Lift access" is the "essential input required for skiing and snowboarding" at a particular ski area. (*Id.* ¶ 109.) Consumers can buy lift access in multiple different ways. Single-day lift tickets are available at all mountains. (*Id.* ¶ 97.) Consumers also have

[2] For this reason, Plaintiffs' claims against Alterra and Vail should have been filed as separate actions, and Alterra intends to move to sever those claims for purposes of trial.

numerous options for multi-day and seasonal passes, including: (1) multi-mountain season passes, e.g., Alterra's Ikon Pass and Ikon Base Pass (*id.* ¶ 86), the Epic Pass and Epic Local Pass sold by Vail (*id.* ¶ 71), and the Indy Pass, which provides access to "dozens of independent ski areas" (*id.* ¶ 130); (2) multi-day passes with multi-mountain access, e.g., Alterra's Ikon Session Pass ("a customizable two-to-four day pass") (*id.* ¶ 86) and Vail's Epic Day Pass (a "customizable one-to-seven day pass") (*id.* ¶ 71); and (3) season passes for individual mountains (*id.* ¶ 93).

Plaintiffs' claims against Alterra center on the Ikon Pass, the Ikon Base Pass, and the Ikon Session Pass (together, "Ikon pass products")—which Plaintiffs conflate into a single pass product despite their meaningful differences. (*See id.* ¶ 9.) These passes provide skiers season-long or multi-day access to multiple mountains that are owned and/or operated by Alterra across the United States and Canada, as well as mountains operated by independent entities with whom Alterra partners. (*Id.* ¶¶ 49–51, 84, 90, 97.) Of the more than 11.5 million skiers in North America annually (*id.* ¶ 5), fewer than one million are alleged to be Ikon passholders (*id.* ¶ 9).

Plaintiffs allege that Alterra's Ikon pass products act as an anticompetitive "tie" between "Destination" and "Regional" ski areas because they provide multi-mountain access at a discounted rate. (*Id.* ¶¶ 104, 108.) Based solely on this theory, Plaintiffs assert three causes of action: (1) unlawful tying under Section 1 of the Sherman Act (*id.* ¶¶ 187–95); (2) unlawful tying under the Colorado Antitrust Act (*id.* ¶¶ 205–13); and (3) unjust enrichment (*id.* ¶¶ 214–20). While Plaintiffs make similar claims against Vail (based on its Epic Pass products), they do *not* allege that Alterra and Vail engaged in

any conspiracy or collusive conduct. Instead, they allege Alterra and Vail each independently adopted similar but distinct bundling strategies at different times and through different products, and acknowledge that Vail and Alterra compete against each other. (*See id.* ¶¶ 70, 80, 143–44.)

## ARGUMENT

To survive dismissal under Rule 12(b)(6), Plaintiffs must plead enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This requires more than "a sheer possibility" that Alterra has acted unlawfully; Plaintiffs' complaint must, instead, raise a "reasonable inference that [Alterra] is liable for the misconduct alleged." *Id.* Neutral facts—those that are just as consistent with lawful, competitive conduct as with unlawful, anticompetitive conduct—do not cross "the line between possibility and plausibility of entitlement to relief" in an antitrust case. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 127 F.4th 178, 186 (10th Cir. 2025) ("So we 'insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed' in [antitrust] cases." (quoting *Twombly*, 550 U.S. at 558)).

### I. PLAINTIFFS DO NOT ALLEGE A PLAUSIBLE TYING CLAIM UNDER THE SHERMAN ACT OR THE COLORADO ANTITRUST ACT

Both the Sherman Act and the Colorado Antitrust Act prohibit agreements that unreasonably restrain competition.[3] 15 U.S.C. § 1; C.R.S. § 6-4-104; *see also Suture*

[3] The Colorado Antitrust Act is construed in accordance with federal antitrust law, so Plaintiffs' federal and state claims may be analyzed together. *Crocs, Inc. v. Joybees, Inc.*, No. 21-cv-02859-GPG-SBP, 2024 WL 3580779, at *2 (D. Colo. July 12, 2024).

*Express, Inc. v. Owens & Minor Distrib., Inc.*, 851 F.3d 1029, 1036 (10th Cir. 2017). "Tying" is an "agreement . . . to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992). Because "[m]any tying arrangements . . . are fully consistent with a free, competitive market," *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 45 (2006), courts will not condemn tying practices unless they "force buyers to forego free choice between sellers" of the tied product, *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1264 (10th Cir. 2006). For that reason, Plaintiffs asserting tying claims must meet "certain threshold requirements" designed to ensure that a challenged practice is "the type of tie" that has, or is highly likely to have, such an anticompetitive effect. *See In re Cox Enters., Inc.*, 871 F.3d 1093, 1097–98, 1100 (10th Cir. 2017).

The reasonableness of an alleged restraint can be analyzed under the *per se* rule or the rule of reason, though the two frameworks overlap considerably when applied to tying claims. A *per se* tying claim requires that: (1) two separate products—and thus two distinct product markets—are involved; (2) the sale of one product (the tying product) is conditioned on the purchase of the other product (the tied product); (3) the seller has sufficient market power over the tying product to restrain competition for the tied product; and (4) the tie has substantial potential to foreclose competition in the tied-product market. *Id*. at 1098, 1104. Under the rule of reason, a plaintiff must make a prima facie showing that the alleged tying practice has a "substantially adverse effect on competition." *Suture Express*, 851 F.3d at 1038. As a practical matter,

satisfying that burden in these circumstances requires plausible allegations as to each element of a *per se* claim. *See Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1178 (10th Cir. 2023) ("The rule of reason requires consideration of these factors alongside the procompetitive justifications for the tying arrangement and the effects of that arrangement in both the tying and tied markets."). Plaintiffs claim Alterra's conduct is unlawful under both theories, but they fail to allege a plausible tying claim under either.

### A. Plaintiffs' Failure to Plead Plausible Relevant Markets Is Fatal to Their Tying Claim under a Per Se or Rule of Reason Analysis

To assert a valid tying claim, Plaintiffs must plausibly define two distinct relevant markets: one for the tying product and a second for the tied product. Market definition is a foundational requirement; without properly defined markets, there is no factual basis for evaluating the plausibility of Plaintiffs' allegations of a tie involving two separate products,[4] Alterra's alleged market power over the tying product,[5] or the alleged foreclosure of competition and anticompetitive effects in the tied-product market.[6] Antitrust claims are routinely dismissed when the complaint does not identify facially

---

[4] *See Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21 (1984) ("[A] tying arrangement cannot exist unless two separate product markets have been linked.").

[5] *See Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) ("Because the relevant market provides the framework against which economic power can be measured, defining the product and geographic markets is a threshold requirement."); *Surgical Assistants*, 127 F.4th at 190 (failure to "plead a legally sufficient market" makes it "impossible to assess whether [defendants] have . . . market power in the relevant market.").

[6] *See Ohio v. Am. Express Co.*, 585 U.S. 529, 542–44 (2018) ("Without a definition of [the relevant] market there is no way to measure [the defendant's] ability to lessen or destroy competition."); *Cavalleri v. Hermes Int'l*, No. 24-cv-01707, 2025 WL 2662897, at *3 (N.D. Cal. Sept. 17, 2025) (complaint did not plead injury to competition in a tied-product market where the complaint did not plead legally sufficient relevant market).

plausible relevant markets. *See, e.g.*, *Surgical Assistants*, 127 F.4th at 189 (affirming dismissal of tying claims); *Campfield*, 532 F.3d at 1118 (affirming dismissal).

A relevant antitrust market must be defined with respect to both the product market and the geographic market. *Surgical Assistants*, 127 F.4th at 187. Plaintiffs' proposed market definitions fail on both counts.

**1. Plaintiffs' alleged product markets are internally inconsistent, incoherent, and implausible.**

The relevant product market identifies the products and suppliers that compete with each other to a substantial degree. It consists of "products that have reasonable interchangeability for the purposes for which they are produced" and thus includes all products that are reasonable substitutes for each other. *Telecor Comm'ns, Inc. v. Sw. Bell Tele. Co.*, 305 F.3d 1124, 1130 (10th Cir. 2002). Plaintiffs cannot "arbitrarily choose the product market relevant to [their] claims," *Surgical Assistants*, 127 F.4th at 187–88, or ignore competition from products or suppliers that "have actual or potential ability to deprive each other of significant levels of business," *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989). Instead, Plaintiffs "must justify any proposed market by defining it with reference to the rule of reasonable interchangeability" and to the "cross-elasticity of demand" between the product itself and substitutes for it. *Surgical Assistants*, 127 F.4th at 187; *Campfield*, 532 F.3d at 1118 (affirming dismissal where proposed market did not "include competitive substitutes").

Plaintiffs' tying claim posits that the single product of "lift access" can be segmented into two distinct product markets: (1) lift access at "Destination" ski areas (the

tying product) and (2) lift access at "Regional" ski areas (the tied product).[7] (Compl. ¶¶ 108–10.) Plaintiffs define Destination ski areas as large, marquee resorts that attract a substantial amount of long-distance travelers. (*Id.* ¶ 112.) By contrast, Regional ski areas are allegedly smaller facilities that rely on and compete for local skiers seeking weekend or day trips. (*Id.* ¶ 113.) According to Plaintiffs, Destination and Regional ski areas do not meaningfully compete with each other because destination-seeking skiers will not substitute a Regional ski area for a Destination one, and local skiers will not substitute a Destination ski area for a Regional one. (*Id.* ¶ 114.) By this logic, Vail's Keystone Resort in Colorado, identified as a Destination ski area (*id.* ¶ 29), competes with Killington Resort in Vermont, also a Destination ski area (*id.* ¶¶ 45–46 & Fig. 2), but not with Alterra's Arapahoe Basin, another ski area cited throughout the complaint (*id.* ¶¶ 60, 152–55) that is not a Destination ski area under Plaintiffs' definition and which is located only six miles from Keystone Resort (*id.* ¶¶ 45–46 & Fig. 2).

As this example demonstrates, Plaintiffs' attempt to separate "lift access" into two different product markets is insufficiently pled and fundamentally flawed. As to local skiers, Plaintiffs ignore obvious competition between Destination and Regional ski areas in close proximity to each other. According to Plaintiffs, Regional ski areas compete with other "nearby regional alternatives" or "nearby ski areas" for local skiers. (Compl. ¶¶ 113, 119.) But Plaintiffs do not allege that these "nearby" ski locations include *only* those that

[7] Alterra uses the terms "Destination" and "Regional" ski areas solely for purposes of this motion, as necessary to address Plaintiffs' tying claims and the problems with them. Alterra disputes that those terms refer to economically distinct markets.

Plaintiffs define as Regional. Nor do they allege why local skiers would not view *all* "nearby" ski locations—Destination or Regional—as substitutes for each other.[8] There is no reason why a skier in Denver would not view Winter Park, an alleged Destination ski area near Denver (*id.* ¶ 42), to be a substitute for Loveland, another Denver area ski location that doesn't fall within Plaintiffs' definition of Destination ski areas (*id.* ¶¶ 45–46 & Fig. 2). Common sense suggests they do.

Vail's 2025 10-K, which the complaint quotes, confirms this.[9] Vail reported that, from 2022–2025, "in-state and local guests" made up over 40 percent of skier visits at North American locations that Plaintiffs classify as Destination ski areas. Vail Resorts, Inc. Form 10-K (2025) at 44–45, at https://investors.vailresorts.com/node/23031/html. (*Cf.* Compl. ¶¶ 42, 45–46 & Fig. 2.) This data shows local skiers view nearby Destination and Regional ski areas as substitutes, such that any properly defined product market must include both. *See Endure Indus., Inc. v. Vizient Inc.*, 164 F.4th 405, 415 (5th Cir. 2026) (proposed market legally deficient where "a quarter [to] a third of customers"

---

[8] Plaintiffs allege only that a local skier "cannot substitute a *distant* destination resort" for a ski location in closer proximity. (Compl. ¶ 114 (emphasis added).) That allegation says nothing about cross-elasticity of demand between Destination and Regional ski areas that are located in the same geographic region. Thus, at most, the complaint suggests only that local skiers do not view ski areas in *other geographic markets* as reasonable substitutes, regardless of whether Plaintiffs classify them as Destination or Regional.

[9] The Court can consider the 10-K because Plaintiffs incorporate it by reference in their complaint. *Cuervo v. Sorenson*, 112 F.4th 1307, 1312 (10th Cir. 2024); *Blackmore v. Carlson*, 574 F. Supp. 3d 1012, 1024 n.22 (D. Utah 2021) (stating that a document is incorporated if the plaintiff "refer[s] extensively to the document"). Plaintiffs cite Vail's 10-K nine times, including for the proposition that Destination ski areas do not compete with Regional ski areas. (Compl. ¶¶ 4, 11, 40, 47–48, 65, 77, 111, 141.) The Court can also consider the 10-K because the complaint expressly refers to it, it is central to Plaintiffs' claims, and it is indisputably authentic. *See Cuervo*, 112 F.4th at 1312.

bought relevant supplies "outside the proposed [] [m]arket," which "strongly suggests reasonably available alternatives" that were not included in the market definition).

Plaintiffs also do not allege any reason so-called destination skiers would not consider many Regional ski areas to be adequate substitutes for lift access. Their lone attempt focuses on *geographic* concerns, not product characteristics. (*See* Compl. ¶ 114.) They allege only that a skier "seeking a destination trip at a marquee resort *in the Rockies*" cannot substitute a "small hill *in the Mid-Atlantic*." (*Id.* (emphasis added).) But, under Plaintiffs' theory and market definitions, that same skier would also exclude roughly 40 percent of alleged Destination ski areas as substitutes because they, too, are not "in the Rockies." (*See id.* ¶ 45 & Fig. 2.[10]) At the same time, Plaintiffs allege no facts as to why that same skier would not view lift access at several Regional ski areas "in the Rockies" to be substitutes for lift access at nearby Destination locations.

Further, Plaintiffs' meager attempt to differentiate between Destination and Regional ski areas on the basis of alleged product characteristics underscores the implausibility of their proposed markets. While Plaintiffs define Destination ski areas to include "only" those identified as "extra-large" ski mountains (*id.* ¶ 112; *see also id.* ¶¶ 45–46 & Fig. 2), their own complaint repeatedly contradicts that classification by characterizing many "extra-large" mountains as "Regional" ski areas (i.e., Stowe, Sugarbush, Okemo, Mount Snow, Killington, Sunday River, and Loon) (*compare id.*,

[10] Figure 2 identifies 31 "extra-large" mountains that Plaintiffs characterize as the universe of Destination ski areas. Thirteen of these 31 mountains are not located in the Rocky Mountains but in Vermont (Killington, Okemo, Sugarbush, Mount Snow, Stowe), Maine (Sunday River), New Hampshire (Loon), California (Palisades, Mammoth, North Star, Sugarbowl), Oregon (Mount Bachelor), and Washington (Crystal Mountain).

Fig. 2, *with id.* ¶¶ 49, 51, 64, 103, 131.) Similarly, while Plaintiffs attempt to define Regional ski areas as those that would not attract long-distance travelers (*id.* ¶¶ 47, 113), they also allege that a consumer who "wishes to ski Regional Ski Areas" has "hundreds [of options] across North America" (*id.* ¶ 129), thus implicitly suggesting that consumers do, in fact, travel to Regional ski areas.

These inconsistencies illustrate the incoherence of Plaintiffs' proposed product market definitions. They are not a mere drafting error. They are the end result of a carefully gerrymandered market structure that is so incoherent that its own proponents have classified over 20 percent of the alleged Destination market as also falling in the Regional market. Plaintiffs' proposed product markets are, thus, legally deficient and facially implausible. *Cf. S. Pines Chrysler-Plymouth, Inc. v. Chrysler Corp.*, 826 F.2d 1360, 1363 (4th Cir. 1987) (holding that plaintiff could not establish a tie between two distinct product markets as a matter of law where the same product was frequently characterized as both the tying and the tied product, depending on market conditions and fluctuations in consumer demand).

**2. Plaintiffs' alleged geographic markets are either facially implausible or insufficiently defined.**

The relevant geographic market is the physical "area of effective competition" for the proposed product market. *Surgical Assistants*, 127 F.4th at 189. This is the area "in which the seller operates, and to which the purchaser can practicably turn" for substitutes for the alleged product. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).

Plaintiffs offer no specificity at all with respect to any geographic market for Regional ski areas. At most, they vaguely allege how those geographic markets can be

defined. (Compl. ¶ 119.) But at no point do they *identify* any proposed geographic market for Regional ski areas. Nor do they define the size of any proposed geographic market by reference to a maximum range of distance or travel time from any city. These deficiencies require dismissal. *See Park 80 Hotels, LLC v. Holiday Hospitality Franchising, LLC*, No. 1:21-cv-04650, 2023 WL 2445437, at *22 (N.D. Ga. Feb. 16, 2023) (dismissing tying claim where the complaint did "not reference any particular geographic location at all"); *Sentry Data Sys. Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1290 (S.D. Fla. 2018) (same; plaintiff alleged the geographic markets were "local" but did not identify them); *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 939 F. Supp. 2d 1002, 1010 (N.D. Cal. 2013) (same; allegation of "various regional markets in California and Oregon" was "vague and conclusory").

**B. Plaintiffs Otherwise Have Failed to Allege a Per Se Tying Claim**

Because Plaintiffs have not properly defined two distinct product markets for the alleged tying product, Destination lift access, and the alleged tied product, Regional lift access, as addressed above (Argument § I.A.), they cannot plausibly allege that Alterra's Ikon pass products involve two separate products. In addition to that core deficiency, Plaintiffs have failed to adequately allege the other required elements of a tying claim.

**1. Plaintiffs do not plausibly allege that Alterra has market power in the proposed tying product market.**

Market power over the tying product is required "in all cases involving a tying arrangement." *Ill. Tool Works*, 547 U.S. at 46; *accord Surgical Assistants*, 127 F.4th at 190; *id.* at 185 n.6. The reason is simple: tying has "the potential of injuring competition" only if the seller has the market power to "*forc[e]* consumers to take the tied product *just*

*to get the tying one*." *Suture Express*, 851 F.3d at 1039 (emphasis added). But "[w]ithout power in the tying market, . . . a customer would not feel obliged to take the tie, as he could simply go elsewhere to buy the tying and tied products separately." *Id.*

"Market power is the power to force a purchaser to do something that he would not do in a competitive market." *Eastman Kodak*, 504 U.S. at 464 (internal quotation marks omitted). It is generally defined by the seller's ability to sustain prices above a competitive level or to exclude competition. *Suture Express*, 851 F.3d at 1039; *Surgical Assistants*, 127 F.4th at 190. For tying claims, there must be "*significant* market power—more than the mere ability to raise price only slightly, or only on occasion, or only to a few of a seller's many customers." *Chase Mfg.*, 84 F.4th at 1180 (emphasis by court).

Plaintiffs' complaint does not plead a plausible factual basis for inferring that Alterra has market power over Destination ski areas. To start, Plaintiffs' failure to allege a legally sufficient tying-product market precludes them from adequately alleging that Alterra has market power in that market. (*See supra* note 4.) But even if they had, their allegations still fail to raise a reasonable inference of market power in that market.

*a. Plaintiffs do not allege sufficient facts to infer market power based on Alterra's market share.*

Controlling a dominant share of a relevant market can raise an inference of market power, while low market share may raise a presumption against it. *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1315 (10th Cir. 2017). Thus, while "market share *alone* is insufficient to establish market power," it "is a focal point" and is often used to infer it. *Id.* Courts have consistently held a seller lacks the requisite market power for a *per se* tying claim when it controls only 30 percent or less of the relevant

market. *See Jefferson Par.*, 466 U.S. at 26–29 (30 percent market share reflects insufficient market power for *per se* claim); *Times–Picayune Pub. Co. v. United States*, 345 U.S. 594, 612–13 (1953) (33–40 percent market share not enough for *per se* claim).[11]

The complaint does not show that Alterra's share of the alleged Destination market meets this threshold. Plaintiffs make no attempt to quantify Alterra's market share. At most, they claim "skier visits," purportedly a common measure of market share, are "concentrated" across the "small group of marquee resorts" identified as extra-large mountains—a group of 31 ski destinations owned by 11 different entities. (Compl. ¶ 137; *id.* ¶¶ 45–46 & Fig. 2.) But, as to *Alterra*, the complaint states only that Alterra owns several "top-ranked" Destination ski areas that "collectively account for millions of additional skier visits annually." (*Id.* ¶ 138.) Plaintiffs allege nothing to raise a reasonable inference that ski demand is "concentrated" at *Alterra's* alleged Destination locations, let alone that it has a dominant share of skier visits among all Destination ski areas.

Moreover, Plaintiffs' own allegations undercut any claim that Alterra has sufficient market share to infer market power. Of the 31 extra-large mountains Plaintiffs use to define the Destination market, Alterra owns only seven—or 22.6 percent. (*See* Compl. ¶¶ 45–46 & Fig. 2.) That is well below the 30 percent "benchmark" courts have used "as

[11] *See also Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 516–17 (3d Cir. 1998) (20–25 percent market share "insufficient as a matter of law"); *Dunafon v. Del. McDonald's Corp.*, 691 F. Supp. 1232, 1242, n.2 (W.D. Mo. 1988) (19–24 percent market share "does not constitute market power"); ABA, *Antitrust Law Developments* 189 (8th ed. 2017) ("Since *Jefferson Parish*, no court has inferred the requisite market power from a market share below 30 percent." (citing cases)).

a floor for plaintiffs seeking to prove a per se claim." *Suture Express*, 851 F.3d at 1042.

*b. Plaintiffs do not otherwise raise a plausible inference that Alterra has the power to control prices or exclude competition.*

Plaintiffs plead no other factual basis for inferring that Alterra has market power. They do not claim it has any ability to drive competitors out of the alleged tying market and their allegations about "supracompetitive" prices are conclusory. (*See* Argument § I.B.3.) More importantly, while Plaintiffs allege Alterra has a substantial presence in the alleged market for Destination lift access, they also allege that Vail has at least as substantial a presence in that market, if not a larger one. (*See, e.g.*, Compl. ¶¶ 45–46 & Fig. 2 (showing Vail owns 10 of the 31 extra-large mountains that allegedly comprise the Destination market, as compared to Alterra's seven).) Defendants' competitors have an even greater collective presence; together, they own 13 of the 31 extra-large mountains that make up the alleged Destination market. (*See id.*) Alterra cannot, by definition, control prices or exclude rivals when faced with such competition. *See Reudy v. Clear Channel Outdoors, Inc.*, 693 F. Supp. 2d 1091, 1127 (N.D. Cal. 2010) (where two firms both had 47.5 percent market share, neither could control prices because "each could undersell the other should one raise prices to a 'supra competitive' level").[12]

*c. Plaintiffs cannot rely on allegations of combined market share or market power to support their tying claims.*

Plaintiffs do not claim Alterra and Vail conspired in any way, and they allege no

[12] *See also Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*, 912 F. Supp. 747, 770–71 (D.N.J. 1995) (no power to control prices or exclude rivals where defendant's market share never exceeded 30 percent and its prices were constrained by the "comparative prices and features offered by its competitors").

facts to raise any such inference. Thus, the plausibility of the complaint's market power allegations must be evaluated separately as to each Defendant. *See In re Wireless Tele. Antitrust Litig.*, 385 F. Supp. 2d 403, 421 (S.D.N.Y. 2005) ("[U]nless the plaintiff has alleged a conspiracy, it is inappropriate to assess one defendant's market power by measuring 'the cumulative power of all defendants practicing tying.'" (quoting Areeda & Hovenkamp, *Antitrust Law* ¶ 1734e, at 49 (2d ed. 2004))). Plaintiffs cannot plausibly plead market power by attributing one Defendant's market share to the other or alleging that, together, they have the power to control prices or exclude competition—though this is exactly what they try to do. (*See, e.g.*, Compl. ¶¶ 4, 17, 46, 134, 138.)

Nor can Plaintiffs demonstrate a plausible basis for market power by resorting to allegations about the combined "ecosystem" of Ikon pass products. (*See, e.g.*, Compl. ¶¶ 4, 46, 134, 140.) As Plaintiffs admit, Alterra's Ikon pass products provide access to numerous ski locations that are *not* owned or operated by Alterra but by independent third parties. (*Id.* ¶¶ 45–46 & Fig. 2.) These independent entities compete vigorously with Alterra, and the complaint does not allege otherwise. The complaint provides no basis for including any independently-owned Destination ski area in the analysis of Alterra's purported market share or market power.

**2. Plaintiffs do not plausibly allege any "tie" that forces skiers to purchase the tying and tied products together.**

An anticompetitive tie exists only if a seller *forces* buyers to purchase the tied product in order to obtain the tying one. *Jefferson Par.,* 466 U.S. at 12 n.17. If the tying product is separately available, "there is no tying problem," even if the seller "also offer[s] the two items as a unit at a single price." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6

n.4 (1968); *accord Chase Mfg.*, 84 F.4th at 1180–81. That is because selling two products "in a single package imposes no unreasonable restraint on either market" when each "can be purchased separately in a competitive market." *Jefferson Par.*, 466 U.S. at 11–12; *accord Fox Motors, Inc. v. Mazda Distribs. (Gulf), Inc.*, 806 F.2d 953, 958 (10th Cir. 1986) ("Presumptive [or *per se*] illegality depends . . . upon the existence of a genuine tying arrangement: the sale of one product conditioned upon the purchases of another.").

Plaintiffs do not allege Alterra imposes any express condition that forces skiers to buy lift access to Alterra's Regional and Destination ski areas together; to the contrary, they admit both can be purchased independently. (*See* Compl. ¶ 97.) They claim Alterra's pricing practices act as an implicit tie, or bundled discount, that "effectively coerc[es]" the purchase of Destination and Regional lift access together because the price of daily lift tickets at Destination ski areas is too high. (*Id.* ¶¶ 122–28.) But bundled discounts are not inherently anticompetitive. On the contrary, they are often *procompetitive*,[13] and thus courts will not condemn bundled discounts as unlawful "ties" unless they are truly coercive. Typically, that means a plaintiff must allege facts showing that buying the bundle is the "only viable economic option" for obtaining the tying product. *See Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1500–01 (8th Cir. 1992); *accord In re Indep. Serv. Orgs. Antitrust Litig.*, 85 F. Supp. 2d 1130, 1145, n.6 (D. Kan. 2000).

Plaintiffs cannot meet this burden, as their own complaint forecloses any such

[13] *See Jefferson Par.*, 466 U.S. at 12 ("Buyers often find package sales attractive; a seller's decision to offer such packages can merely be an attempt to compete effectively—conduct that is entirely consistent with the Sherman Act.").

inference. To begin, Plaintiffs state that the 2022-23 ski season allegedly "set a record with 11.6 million unique participants" (Compl. ¶ 39)—but that there are fewer than "1 million Ikon Pass members" (*id.* ¶ 9). That means more than 90 percent of skiers obtained lift access without buying an Ikon pass product. Alterra's Ikon pass products cannot be the only viable economic option for Destination lift access under these facts. *See Ramallo Bros. Printing v. El Dia, Inc.*, 392 F. Supp. 2d 118, 135 (D.P.R. 2005) ("Defendants cannot be offering the only viable economic option when [purchasers] frequently reject their [bundled] offers." (internal quotation marks omitted)); *cf. Ortho Diagnostic Sys., Inc. v. Abbott Lab'ys, Inc.*, 920 F. Supp. 455, 471–72 (S.D.N.Y. 1996) (finding that buying the allegedly tied products "at the unbundled prices was not economically prohibitive" where 17 percent of defendant's revenue came from non-bundled sales).

The complaint also recognizes that skiers have many options for buying lift access to Destination or Regional ski areas, further undermining any claim that Alterra's Ikon pass products are the only realistic option for visiting Destination ski areas. Such options include daily lift tickets for individual mountains and various types of single- and multi-mountain seasonal passes. (Compl. ¶¶ 93, 97, 130.) Still further, Plaintiffs do *not* claim that discounted passes are not sold for individual Destination ski areas, such as Winter Park—where discounted daily and season passes are offered. In fact, the complaint alleges no facts about whether, or under what conditions, Alterra offers seasonal or other pass offerings for individual Destination ski areas—despite admitting that "other ski passes grant[] access to certain" unnamed ski areas that Plaintiffs classify as Destination ski areas. (*Id.* at 18; *see also id.* ¶¶ 45–46.)

Plaintiffs' specific allegations of purported economic coercion also fail to state a plausible basis for an implicit tie. Plaintiffs claim daily lift tickets for Destination ski areas are "prohibitively expensive" (Compl. ¶ 123), but they allege no facts supporting that conclusory assertion, and the rest of complaint undermines it. The same goes for their claim about "supracompetitive" prices. (*Id.* ¶ 106 & p. 46.) Plaintiffs do not allege any price-fixing or other collusive conduct by Defendants, and they recognize that each independently adopted its multi-mountain pass products and pricing practices. (*See id.* ¶¶ 70, 84.) Plaintiffs also allege nothing about the prices charged for daily, multi-day, or seasonal lift access at Destination ski areas owned by Defendants' competitors. Without that information, the court cannot evaluate the plausibility of Plaintiffs' conclusory assertion that Alterra charges "supracompetitive" or coercive prices, as it is equally plausible that such prices are competitive and consistent with fair market value.[14] Indeed, Plaintiffs' own complaint suggests there's a logical reason for high prices—there's high demand for lift access at "marquee" and "highly desirable" Destination ski areas. (*Id.* ¶¶ 122, 136, 139.)

**3. Plaintiffs do not plausibly allege any potential or actual harm to competition in the tied-product market.**

Tying practices are not anticompetitive unless they have the potential to harm competition by cutting off competitors' access to the tied-product market; otherwise, tying "does not exemplify the vice that led the Supreme Court to declare [it] a *per se*

[14] *See, e.g.*, *Phhhoto Inc. v. Meta Platforms, Inc.*, No. 21-cv-5159, 2026 WL 872963, at *11 (E.D.N.Y. Mar. 30, 2026) (allegations of "supracompetitive" prices conclusory when "not supported with sufficient factual detail as to what constitutes a supracompetitive price in the [relevant] market" or how defendant's pricing compares to its competitors' prices).

offense." *Cox Enters.*, 871 F.3d at 1101 (quoting *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 835 (7th Cir. 1978)) (internal alterations omitted). Thus, under the *per se* rule, Plaintiffs must establish that Alterra's Ikon pass products have "substantial potential to foreclose competition" for the alleged tied product—lift access at Regional ski areas. *Id.* at 1104. Satisfying that standard requires plausible allegations "of actual or potential anticompetitive effects in [that alleged] market." *Id.* The complaint does not raise a plausible inference of foreclosure or anticompetitive effects in the tied-product market under these standards.

*a. Plaintiffs' foreclosure claims are conclusory and implausible.*

To allege foreclosure, Plaintiffs must show that Alterra's Ikon pass products have substantial potential to preclude competitors from fairly competing for skiers who want to use Regional ski areas. *See Chase Mfg.*, 84 F.4th at 1181 ("It is only when the buyer's freedom to choose a given product is restricted that the tying doctrine comes into play." (quoting *Ungar v. Dunkin' Donuts of Am., Inc.*, 531 F.2d 1211, 1226 (3d Cir. 1976)); *Abraham*, 461 F.3d at 1264 (unlawful ties "deny competitive access to the tied product market . . . and force buyers to forego free choice between sellers" (quoting *Ohio-Sealy*, 585 F.2d at 834)). They do not.

At the outset, it is important to recognize what the complaint does *not* allege. Plaintiffs—three of whom reside in Colorado (Compl. ¶¶ 24–26)—do not allege what specific Ikon pass product they purchased or why; what other ski pass products they may have purchased; where they skied, how often, and why; or that they did not ski at a preferred Regional ski area because they felt compelled to ski at only those locations

included on the pass product they chose to buy. Nor do they plausibly allege that Ikon passholders are somehow *precluded* from choosing to ski at locations outside their pass ecosystem, including at other Regional ski areas, because they bought an Ikon pass product. Ikon passholders, in other words, do not give up the freedom to ski at the location of their choice.[15] In fact, two named Plaintiffs purchased *both* the Ikon Pass and either an Epic Pass from Vail *(id.* ¶ 24) or daily lift tickets from Vail (*id.* ¶ 27). Plaintiffs also do not allege that any Regional ski area has been forced to close because of Alterra's Ikon pass products, or that consumer choice is otherwise limited by the existence of fewer options for Regional ski areas (i.e., reduced output).

Instead, Plaintiffs' foreclosure allegations presume, without factual support, that (1) having been "forced" to buy Destination and Regional lift access together in the form of an Ikon pass product just to access Destination ski areas (*but see* Argument § I.B.3), (2) skiers must *unwillingly* forego preferable substitutes for Regional ski areas outside the Ikon pass system for an entire ski season, just to recoup their investment (*see* Compl. ¶¶ 128–29, 143, 157). Absent those predicates, the discounted bundle offered by Ikon pass products is not the "the type of tie that could potentially harm competition in the tied-product market." *Cox Enters.*, 871 F.3d at 1100. Commercial realities—including those reflected in the complaint itself—demonstrate the implausibility of this theory.

First, Plaintiffs' own allegations contradict their foreclosure theory. Plaintiffs admit

---

[15] This is in stark contrast to the alleged tying arrangement in *Suture Express*, where buyers could obtain a discount on the tying product only if they purchased 90 percent of their needs for the tied product from the defendant. *See Suture Express, Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1217, 1220 (D. Kan. 2013).

(and then ignore) that Alterra sells the Ikon Session Pass—a “less expensive” two- to four-day multi-mountain pass. (Compl. ¶¶ 71, 86.) But, because it only offers up to four days of lift access, the Ikon Session Pass plainly does not present the alleged season-long “lock-in” or “sunk-cost” effect that undergirds Plaintiffs’ foreclosure theory. (*Cf. id.* ¶¶ 128–29, 143, 157.) Thus, while it may provide discounted, bundled access to both Destination and Regional ski areas, it is not “the type of tie” that is likely to foreclose competition in the tied-product market. *Cox Enters.*, 871 F.3d at 1100.

Second, the array of options for Destination lift access allows independent Regional ski areas to compete for local skiers *before* they buy an Ikon pass product. (*See* Pls.’ Allegations; Argument § I.B.3.) That includes the Ikon Session Pass, which presents no foreclosure risk despite being part of the challenged bundling practice. (*See* Compl. ¶ 9.) Thus, skiers who *want* to use Regional ski areas outside the Ikon pass system can account for that option when choosing how to buy Destination lift access—even if they are allegedly “forced” to buy bundled access to both Destination and Regional ski areas through the Ikon Session Pass. That is the essence of competition. *See Expert Masonry, Inc. v. Boone Cty., Ky.*, 440 F.3d 336, 347 (6th Cir. 2006).

And, third, rather than alleging that independent ski areas are precluded from trying to appeal to local skiers or are otherwise shut out of the market for Regional lift access, Plaintiffs allege the opposite. The only allegations about the actual conduct of independently-owned Regional ski areas is that they compete by offering “comparatively low lift ticket prices” and heralding the presence of lighter crowds. (Compl. ¶¶ 159–61.) But lower prices and higher quality of experience are evidence of *procompetitive*, not

anticompetitive, effects in the tied-product market.[16] *See, e.g.*, *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 986 (10th Cir. 2022). Thus, the complaint does not plausibly suggest that any alleged tie has substantial potential to foreclose competition in the alleged tied-product market.

*b. Plaintiffs do not adequately allege anticompetitive effects in the tied-product market.*

Plaintiffs also fail to allege any other anticompetitive effects in the market for lift access at Regional ski areas—such as higher prices, lower quality, or reduced choice. To the extent they allege anticompetitive effects in the form of higher prices or reduced quality, they do so only as to *Destination* ski areas. (*See* Compl. Fig. 2 & ¶¶ 100–03 (citing high prices at Park City, Deer Valley, Stowe, and Sugarbush, all Destination ski areas); *id.* ¶¶ 148–51 (lower quality).) By definition, such claims do not show harm to competition in the alleged tied-product market, i.e., lift access for *Regional* ski areas.

Nor do Plaintiffs adequately allege reduced choice in the tied-product market. Anticompetitive diminishment of consumer choice means reducing choice "through the exclusion of 'would-be competitors.'" *HDMI Licensing Adm'r, Inc. v. Availink Inc.*, No. 22-cv-06947, 2025 WL 3774989, at *13 (N.D. Cal. Dec. 31, 2025) (quoting *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983–84 (9th Cir. 2023)). Here, Plaintiffs allege only that Ikon passholders may *perceive* a limitation on choice *once they have already bought* an

---

[16] Plaintiffs speculate that lower prices are unsustainable (Compl. ¶ 132), but they plead no facts to support that claim. To the extent there is any related factual allegation, it is premised on the suggestion of diverted traffic to an extra-large mountain or Destination ski area—Sugarbush—not a Regional ski area. (*Id.* ¶ 131; *see also id.* ¶¶ 45–46 & Fig. 2 (identifying Sugarbush as an extra-large mountain and Destination ski area).)

Ikon pass product. (Compl. ¶¶ 155–56.) They do not allege any decrease in market-wide options for Regional lift access. Nor could they. As alleged, there are over 700 Regional ski areas in North America (*id.* ¶ 36), of which Alterra owns nine, at most (*compare id.* ¶ 83 & Fig. 9 (list of 16 Alterra resorts), *with id.* ¶¶ 45–46 & Fig. 2 (list of Destination ski areas)).

**C. Plaintiffs Have Not Adequately Alleged a Rule of Reason Tying Claim**

Plaintiffs also fail to allege a plausible tying claim under their alternative theory, the rule of reason. (*See* Compl. ¶ 166.) For that claim, Plaintiffs must show the alleged tie unreasonably restrains competition, taking into consideration procompetitive justifications and the availability of less restrictive alternatives. *Suture Express*, 851 F.3d at 1037–38. Plaintiffs bear the initial burden of proving the alleged restraint has "a substantially adverse effect on competition" in the tied-product market. *Id.*; *see Jefferson Par.*, 466 U.S. at 21, 30 (plaintiff's burden "necessarily involves an inquiry into the actual effect" of the alleged tie on competition in the tied-product market). Thus, at the pleading stage, they must allege facts raising a plausible inference of such an effect.

Plaintiffs do not meet this burden. First, their failure to allege plausible relevant markets precludes their rule of reason claim. (*See* Argument § I.A.) The rule of reason requires "a fact-specific assessment of market power and market structure" to assess the restraint's "actual effect on competition." *Am. Express*, 585 U.S. at 541 (internal quotation marks omitted). So, Plaintiffs must "allege a valid market." *Surgical Assistants*, 127 F.4th at 186; *see also Am. Express*, 585 U.S. at 543 ("[C]ourts . . . cannot properly apply the rule of reason without an accurate definition of the relevant market."). Second, Plaintiffs

do not plausibly allege any adverse competitive effect. To do that, they needed to allege facts showing either actual harm in the form of higher prices, restricted output, or reduced quality in the tied-product market or, alternatively, that Alterra has sufficient market power to infer such harm. *See Buccaneer*, 846 F.3d at 1311. They do neither. (*See* Argument §§ I.B.1 & I.B.3.) The Court should thus dismiss Plaintiffs' rule of reason claim because they do not adequately allege plausible relevant markets, Alterra's market power in the alleged tying-product market, or actual anticompetitive effect in the tied-product market.

## II. PLAINTIFFS' UNJUST ENRICHMENT CLAIM SHOULD ALSO BE DISMISSED

To state a plausible claim for unjust enrichment, Plaintiffs must allege sufficient facts to raise a reasonable inference that Alterra has retained a benefit conferred by Plaintiffs "under circumstances that would make it unjust for [Alterra] not to make restitution." *Van Zanen v. Qwest Wireless, LLC*, 550 F. Supp. 2d 1261, 1266 (D. Colo. 2007); *accord Columbia Plaza Assocs. v. Ne. Univ.*, 227 N.E.3d 999, 1018 (Mass. 2024). Here, Plaintiffs' unjust enrichment claim is based solely on the allegedly anticompetitive conduct addressed above. Thus, Plaintiffs' unjust enrichment claims should be dismissed for the same reasons as their antitrust claims.

## CONCLUSION

Plaintiffs have not and cannot adequately allege tying claims based on Alterra's Ikon pass products because those claims are fundamentally implausible. Anticompetitive tying arrangements are those that foreclose competition by restricting consumer choice. Alterra's Ikon pass products do the opposite—they provide consumers increased choice and flexibility at a discounted rate. All of Plaintiffs' claims should be dismissed.

Dated: June 18, 2026.

Respectfully submitted,

*s/ Kathryn A. Reilly*

Kathryn A. Reilly
Michael Baker
Natalie West
Kendra Sendler Kumor
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
Telephone: 303.244.1800
Facsimile: 303.244.1879
Email: reilly@wtotrial.com
mbaker@wtotrial.com
west@wtotrial.com
kumor@wtotrial.com

Attorneys for Defendant Alterra Mountain Company

## CERTIFICATE OF SERVICE (CM/ECF)

I HEREBY CERTIFY that on June 18, 2026, I electronically filed the foregoing DEFENDANT ALTERRA MOUNTAIN COMPANY'S MOTION TO DISMISS with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/ Kathryn A. Reilly*