**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:26-cv-01191-RMR-SBP

LANDIN GOLOJA,
TYLER MAYBEE,
CAITLAN REYNOLDS, and
DANIEL SHEINER, on behalf of
themselves and all others similarly situated,

Plaintiffs,

v.

VAIL RESORTS, INC., and
ALTERRA MOUNTAIN COMPANY,

Defendants.

---

**VAIL RESORTS' MOTION TO DISMISS**

---

## TABLE OF CONTENTS


INTRODUCTION .......... 1

ALLEGATIONS IN THE COMPLAINT .......... 3

- A. Vail Resorts' Lift Access Offerings .......... 3
- B. Plaintiffs' Tying Theory .......... 4
- C. Plaintiffs' Pleading Omissions .......... 5

LEGAL STANDARD .......... 5

ARGUMENT .......... 6

I. Plaintiffs Fail to State a Tying Claim .......... 6

- A. Plaintiffs' Labels Do Not Create Two Separate Products .......... 8
- B. The Epic Pass Does Not Coerce Anyone Into Buying a Tied Product .......... 10

II. Plaintiffs Fail to Plead Coherent Relevant Markets .......... 13

- A. The Destination/Regional Divide Does Not Track Consumer Substitution .......... 14
- B. Plaintiffs' Own Allegations Contradict Their Proposed Markets .......... 15
- C. Plaintiffs Do Not Define Any Regional Geographic Market .......... 16

III. Plaintiffs Fail to Plead Vail Resorts' Market Power in the Alleged Tying Market .......... 17

IV. Plaintiffs Fail to Plead Foreclosure in Any Tied Market .......... 19

- A. Plaintiffs Plead No Foreclosure Denominator .......... 20
- B. Plaintiffs Plead No Foreclosure Numerator .......... 20
- C. Plaintiffs Allege a Sunk-Cost Incentive, Not Foreclosure .......... 21

V. The Unjust Enrichment Claim Fails With the Antitrust Claims .......... 22

VI. No Named Plaintiff Can Maintain Class Claims Against Vail Resorts .......... 23

- A. Maybee and Reynolds Lack Article III Standing .......... 24
- B. Maybee, Reynolds, and Sheiner Lack Antitrust Standing .......... 24

CONCLUSION .......... 26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................ 5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................ 5

*Bisaillon v. Vail Resorts, Inc.*,
No. 25-cv-2056, 2026 WL 820815 (D. Colo. Mar. 25, 2026).................................... 23

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)........................................................................................ 13

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
532 F.3d 1111 (10th Cir. 2008)........................................................ 14, 15, 16

*Chase Mfg., Inc. v. Johns Manville Corp.*,
84 F.4th 1157 (10th Cir. 2023).................................................... 7, 10, 11, 12, 17, 20

*Endure Indus., Inc. v. Vizient Inc.*,
164 F.4th 405 (5th Cir. 2026)........................................................................ 14

*Fox Motors, Inc. v. Mazda Distributors (Gulf), Inc.*,
806 F.2d 953 (10th Cir. 1986)........................................................................ 21

*GFF Corp. v. Assoc. Wholesale Grocers, Inc.*,
130 F.3d 1381 (10th Cir. 1997)........................................................................ 4

*Grappone, Inc. v. Subaru of New Eng.*,
858 F.2d 792 (1st Cir. 1988)........................................................................ 17

*In re: Cox Enters., Inc.*,
871 F.3d 1093 (10th Cir. 2017).......................................... 7, 16, 17, 19, 20, 21, 25

*In re EpiPen Marketing, Sales Practices and Antitrust Litigation*,
44 F.4th 959 (10th Cir. 2022)........................................................................ 12

*Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.*,
77 P.3d 814 (Colo. App. 2003)........................................................................ 23

*International Salt Co. v. United States*,
332 U.S. 392 (1947)....................................................................................... 7

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984)............................................................................... 8, 9, 25

*Lewis v. Casey*,
518 U.S. 343 (1996)..................................................................................... 24

*Mahon v. Ticor Title Ins. Co.*,
683 F.3d 59 (2d Cir. 2012)............................................................................ 24

*Matney v. Barrick Gold of N. Am.*,
80 F.4th 1136 (10th Cir. 2023)........................................................................ 4

*McAuliffe v. Vail Corp.*,
69 F.4th 1130 (10th Cir. 2023)...................................................................... 23

*N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*,
162 F.4th 1268 (10th Cir. 2025).................................................................... 25

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)..................................................................................... 14

*O'Toole v. Northrop Grumman Corp.*,
499 F.3d 1218 (10th Cir. 2007) ..................................................................... 13

*Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*,
131 F.3d 874 (10th Cir. 1997)............................................................... 6, 24, 25

*Suture Exp., Inc. v. Cardinal Health 200, LLC*,
963 F. Supp. 2d 1212 (D. Kan. 2013) ...................................................... 17, 21

*Suture Exp., Inc. v. Owens & Minor Distrib., Inc.*,
851 F.3d 1029 (10th Cir. 2017)............................................................... 6, 7, 17

*Times-Picayune Publ'g Co. v. United States*,
345 U.S. 594 (1953)..................................................................................... 18

*United States v. Connecticut Nat'l Bank*,
418 U.S. 656 (1974)..................................................................................... 16

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001)........................................................................... 8

*Van Zanen v. Qwest Wireless, LLC*,
550 F. Supp. 2d 1261 (D. Colo. 2007) .......... 22

*VDARE Found. v. City of Colorado Springs*,
11 F.4th 1151 (10th Cir. 2021) .......... 5

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*,
529 U.S. 765 (2000) .......... 6, 24

**Statutes**

C.R.S.A. § 6-4-104 .......... 6

15 U.S.C. § 1 .......... 6

**Other Authorities**

Federal Rule of Civil Procedure
12(b)(1) .......... 1, 23
12(b)(6) .......... 1, 5
12(f) .......... 1

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (5th ed. 2025) .......... 18, 19

Vail Resorts moves to dismiss Plaintiffs' Class Action Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and, in part, for lack of subject matter jurisdiction under Rule 12(b)(1). Vail Resorts has contemporaneously filed a motion to strike class allegations pursuant to Rule 12(f). *See* ECF No. 34.[1]

Vail Resorts conferred with Plaintiffs by telephone on May 18, 2026, regarding the grounds in this motion. Plaintiffs chose not to amend their Complaint. Civ. Pr. Std. 7.1B(b).

## INTRODUCTION

The primary product Vail Resorts sells to its guests is lift access—the right to ride a resort's lifts and enjoy its terrain. Vail Resorts offers guests multiple ways to access its resorts, ranging from single-day lift tickets and limited multi-day passes to local and multi-resort season passes. Those products differ in price, timing, restrictions, and access. Importantly, Vail Resorts discounts lift access products that are purchased in advance. The purpose and effect of these diversified, advance-commitment options is to maximize customer choice so that guests can choose when, where, and how often to access any of Vail Resorts' 42 mountains during a season.

This lawsuit tries to recast that choice as coercion in order to manufacture an antitrust claim. Plaintiffs say that one of Vail Resorts' pass offerings—the all-season Epic Pass—unlawfully forces guests who seek affordable access to the company's "Destination Ski Resorts" to also buy access to so-called "Regional Ski Areas." This discounted pass, according to Plaintiffs, is an unlawful tying of two separate "products."

[1] Defendants filed an opposed motion for leave to file excess pages. ECF No. 28. That motion is under consideration. If the Court denies that motion, Vail Resorts will revise and refile this motion to dismiss consistent with the Court's instructions.

There is no tie. First, Plaintiffs do not plausibly plead two distinct products for antitrust purposes. The product they identify throughout the Complaint is lift access, and their attempt to subdivide that access into "Destination" and "Regional" categories does not track separate consumer demand. But even if those categories described separate products, Vail Resorts forces no one to buy anything: it sells access to "Destination Ski Resorts" without requiring a guest to buy the supposed tied product; Vail Resorts imposes no penalty on customers who go elsewhere; and—as Plaintiffs admit—Vail Resorts sold lift tickets to a named Plaintiff who never bought an Epic Pass at all. A discounted pass product that rewards advance commitment is not coercion. It is choice.

Plaintiffs' antitrust claims fail for other reasons, too. They plead no plausible relevant market, dividing resorts into "Destination" and "Regional" categories that are so unstable that, in multiple instances, the same mountain lands in either alleged market depending on which paragraph of the Complaint one reads. The Complaint also fails to plead market power because it never quantifies Vail Resorts' share of any market and instead lumps Vail Resorts together with Alterra—its main competitor—even though Plaintiffs concede that both companies acted independently. And the Complaint fails to plead that any company was foreclosed from competing to sell access to "Regional Ski Areas" to Plaintiffs or anyone else. Instead, Plaintiffs offer only a theory that Epic Pass holders might *feel* they should use what they already paid for—a sunk-cost preference that excludes no competitor from anything. The derivative unjust-enrichment claim falls with the antitrust claims. Finally, this case cannot proceed as a class action against Vail Resorts: two plaintiffs lack standing because they bought nothing from Vail Resorts, and

the other two waived their class claims.

It is worth noting at the outset what this suit does *not* allege. Plaintiffs do not claim Vail Resorts agreed or conspired with anyone to impair competition—to the contrary, they affirmatively plead that Vail Resorts and Alterra acted independently. Compl. ¶¶ 143–44. They also do not allege Vail Resorts monopolized any market, refused to deal with any competitor, or charged any customer more for choosing to go elsewhere. Stripped of its labels, the Complaint alleges only this: Vail Resorts sells popular season-pass products at a discount, and many guests choose to buy them each year. That is healthy competition, not an antitrust violation. The Complaint should be dismissed.

## ALLEGATIONS IN THE COMPLAINT

### A. Vail Resorts' Lift Access Offerings

In 2008, Vail Resorts launched the Epic Pass—a multi-resort season pass that offers access to Vail Resorts' owned mountains and its partner resorts, which now includes locations across the United States, Canada, Europe, and Australia. Compl. ¶ 70. The Epic Pass enhances flexibility and affordability by allowing skiers who purchase season tickets in advance to access a variety of mountains with greater frequency and discounted pricing. *See* Compl. Fig. 2, ¶¶ 49-51, 70, 78, 97.[2] The "Epic Pass" is not a single product; Vail Resorts offers multiple different pass options to allow access across different resort portfolios, for different numbers of days, and at different price points.

[2] Advance purchase is a fundamental feature of the discounted Epic Pass. As a *New York Times* article explains (Compl. ¶ 14, n.4), "Ski resorts' balance sheets depend heavily on snowfall—a business model now under stress as climate change disrupts winter weather patterns. The subscription model lets Vail hedge against some seasonal risk. [Vail Resorts] used the upfront payments to finance investments like snow makers …."

Compl. ¶ 71; Vail Resorts' 2025 10-K ("Vail Resorts 10-K") at 10-11, https://bit.ly/4fU2oWP (EDGAR).[3] Advance-commitment pass products are comparable only in the sense that they can be differentiated from daily lift tickets, which are purchased for a single resort for a specific day. *See generally id*.

Plaintiffs allege that 2.3 million customers purchased some form of Epic Pass for the 2024–2025 ski season. Compl. ¶ 70. Sometimes the Complaint alleges that the "Epic Pass" forces customers to purchase lift access at Vail Resorts' so-called "Regional" ski areas in order to obtain discounted access to Vail Resorts' "Destination" mountains. *See* Compl. ¶¶ 104, 108. Other times, Plaintiffs concede that certain Epic Pass products sold by Vail Resorts offer lift access to "Destination" resorts without having to purchase lift access to a "Regional" ski area. *See* Compl. ¶ 71.

### B. Plaintiffs' Tying Theory

Plaintiffs characterize the discounts offered through the Epic Pass as a "tying" arrangement between two purportedly separate "products": (1) lift access at "Destination Ski Resorts" (the main or "tying" product) and (2) lift access at "Regional Ski Areas" (the secondary or "tied" product). Compl. ¶ 108. Plaintiffs define "Destination Ski Resorts" (the tying market) as "larger than Regional Ski Areas," including "Extra-Large mountains," and

[3] This court may consider Vail Resorts' 2025 10-K because it is incorporated into Plaintiffs' Complaint and referenced for key allegations central to Plaintiffs' claims. *See* Compl. ¶¶ 4, n.1; 11, n. 3; 40, n.6; 47, n.7; 48, n.8; 77, n.17; 111, n. 21; 141, n.23. Plaintiffs also cite Vail Resorts' 2024 10-K at ¶ 65, n.12. *GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) (affirming dismissal and refusal to convert to motion for summary judgment where document relied on was "referred to in the complaint and is central to the plaintiff's claim"); *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1145 (10th Cir. 2023) ("[f]actual allegations that contradict … a properly considered document are not well-pleaded facts that the court must accept as true").

as providing accommodations that are on or near the mountains. Compl. ¶¶ 41, 45. Plaintiffs define "Regional Ski Areas" (the tied market) as mountains that rely more heavily on local skiers and "tend to be smaller … and have fewer amenities" than "Destination Ski Resorts." Compl. ¶ 47. In other words, the "products" for this antitrust lawsuit are "lift access" to Plaintiffs' two categories of ski areas.

### C. Plaintiffs' Pleading Omissions

Plaintiffs do not quantify Vail Resorts' share of the market for "Destination Ski Resorts," meaning that Plaintiffs do not exclude the possibility that customers could turn to other "Destination Ski Resorts" if Vail Resorts priced lift tickets too high. Nor do Plaintiffs allege facts to establish that competition is foreclosed for customers seeking to access "Regional Ski Areas." In fact, Plaintiffs do not even allege that Vail Resorts *competes* in every "Regional Ski Area" market. While Plaintiffs allege that Vail Resorts and Alterra each independently adopted a similar marketing strategy, the Complaint does not allege that Vail Resorts and Alterra coordinated their conduct in any way. Plaintiffs allege that Vail Resorts and Alterra, together, "account for a dominant share" of "Destination Ski Resorts" but do not separate out or quantify the two competitors' market shares. Compl. ¶ 139.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]he court need not accept conclusory allegations without supporting factual averments[.]" *VDARE Found. v. City of Colorado Springs*, 11 F.4th

1151, 1159 (10th Cir. 2021) (internal quotations omitted).

As a precursor to any claim, a plaintiff also must allege facts sufficient to demonstrate Article III standing, meaning that they suffered an actual injury, caused by defendant's conduct, that is redressable by the requested relief. *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000). In addition, an antitrust plaintiff must plead facts to support antitrust standing, meaning facts that demonstrate the plaintiff's injury "flows from that which makes defendants' acts unlawful" and bears "a direct causal connection … [to] defendant's violation of the antitrust laws." *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 882 (10th Cir. 1997).

## ARGUMENT

### I. PLAINTIFFS FAIL TO STATE A TYING CLAIM

Strip away the labels and this case is simple: Vail Resorts sells a popular advance-commitment pass at a discount, millions of people choose to buy it, and Plaintiffs say that practice is illegal. It is not. Advance-commitment and bundled discounts are normal, procompetitive features of American commerce. *See Suture Exp., Inc. v. Owens & Minor Distrib., Inc.*, 851 F.3d 1029, 1037 (10th Cir. 2017) ("buyers often find package sales attractive" meaning that "a seller's decision to offer such packages can merely be an attempt to compete effectively"). They cross into antitrust territory only when they operate as a genuine "tying" arrangement. *See id*. The Epic Pass is not a tie.

To state a tying claim under Section 1 of the Sherman Act and the Colorado Antitrust Act, a complaint must plausibly plead four facts: (1) two separate products, (2) the sale of one product conditioned on purchase of the other, (3) market power in the

tying product, and (4) foreclosure of a substantial volume of commerce in the tied product. *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1178 (10th Cir. 2023); *In re: Cox Enters., Inc.*, 871 F.3d 1093, 1104 (10th Cir. 2017).[4] The classic illustration of an unlawful tie is when, for example, a manufacturer of a patented salt-processing machine (the tying product) will lease its machine to a customer only if the customer agrees to use the manufacturer's salt (the tied product). *See International Salt Co. v. United States*, 332 U.S. 392 (1947). Forcing a customer to buy your salt in order to lease the machine is a tie. Offering a better price to guests who buy an advance-commitment season pass is not.

Plaintiffs cannot satisfy a single element of their tying claim, let alone all four. They have not pleaded two separate products (§ I.A) or any conditioning of one on the other (§ I.B). And as the sections that follow show, Plaintiffs have not pleaded a coherent market (§ II), Vail Resorts' power within a coherent market (§ III), or foreclosure of any competitor from such a market (§ IV). It does not matter whether the Court applies the *per se* rule or the rule of reason—the antitrust scrutiny tests Plaintiffs invoke in the alternative, Compl. ¶ 166—because Plaintiffs fail to allege required elements of tying under either approach.[5]

---

[4] Courts assess tying claims under either a *per se* or "rule of reason" analysis. A *per se* violation is established upon proving each factor of the four-factor test, while "[t]he rule of reason requires consideration of these factors alongside the 'procompetitive justifications for the tying arrangement' and 'the effects of that arrangement in both the tying and tied markets.'" *Johns Manville*, 84 F.4th at 1178. "[T]he rule of reason seems to be mainly different in degree, not necessarily in kind." *Suture Exp.*, 851 F.3d at 1038.

[5] *See Johns Manville*, 84 F.4th at 1180 (finding no "genuine issue of material fact about whether [the defendant] maintained an unlawful tying arrangement" where there was no evidence of foreclosure); *Cox Enters.*, 871 F.3d at 1112 n.13 (resolving *per se* claim for failure to show foreclosure and noting that "[b]ecause their claim failed under the more plaintiff-friendly per se analysis, it would also likely fail under the more demanding rule-of-reason analysis"); *Suture Express*, 851 F.3d at 1039 ("Without power in the tying

### A. Plaintiffs' Labels Do Not Create Two Separate Products

Whether a defendant has sold "two separate products"—the first element of any tie—"turns not on the functional relation between them, but rather on the character of the demand for the two items." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984). Two products are distinct only where there is "sufficient demand for the purchase of" the tied item "separate from" the tying item. *Id.* at 21–22. A single product does not become two simply because, as here, a plaintiff attaches two names to it; absent separately identifiable demand, "a tying arrangement cannot exist." *See id.* at 20–21. To determine whether two products exist for the purposes of a tying claim, courts look to whether consumers treat the two products as distinct, as opposed to comparable substitutes. *United States v. Microsoft Corp.*, 253 F.3d 34, 86 (D.C. Cir. 2001).

The product Vail Resorts sells is lift access—the right to ride a resort's lifts and enjoy its terrain. Vail Resorts sells that product in a range of options that differ in price, timing, and breadth: single-day lift tickets, limited multi-day passes, local passes, and multi-resort season passes. Compl. ¶¶ 71, 109. Plaintiffs recognize that the relevant "product" at issue in *each* of their alleged markets is "lift access." Compl. ¶¶ 109–10.

But Plaintiffs then attempt to segregate lift access into two different "products" by sorting *mountains* into two broad categories: "Destination Ski Resorts" and "Regional Ski Areas." Compl. ¶¶ 41, 45, 47. The problem with that approach is that Plaintiffs distinguish those categories by limited *characteristics of the resorts*—size, amenities, and the mix of

market, we would expect that a customer would not feel obliged to take the tie, as he could simply go elsewhere to buy the tying and tied products separately.").

local versus out-of-town visitors—rather than by any separate demand for the supposed products (lift access). They describe "Destination Ski Resorts" as "larger" resorts that include "Extra-Large mountains" that guests will travel long distances to enjoy, Compl. ¶¶ 41, 45, in contrast to "Regional Ski Areas," which are mountains that "tend to be smaller … and have fewer amenities" and draw more local skiers, Compl. ¶ 47. But for an antitrust claim to proceed past a motion to dismiss, Plaintiffs must do more than superficially label a product by some of its characteristics. The law requires Plaintiffs to plead facts sufficient to establish two distinct products that have separate demand. *Jefferson Parish*, 466 U.S. at 19, 21–22. Plaintiffs do not do this.[6]

Nor do Plaintiffs' labels track a real division in consumer demand. Plaintiffs give lip service to this requirement in their Complaint, *see* ¶ 114, but fail to allege facts necessary to support their conclusion. Skiers buy lift access at both "Destination" and "Regional" resorts, and resorts in both categories compete for the same customers. *See infra* § II. Because Plaintiffs fail to adequately plead separate consumer demand for "Destination" versus "Regional" lift access—and instead describe a unified demand across resort types—they cannot satisfy their burden because "a tying arrangement cannot exist unless two separate product markets have been linked." *Jefferson Parish*, 466 U.S. at 20–21.

[6] Plaintiffs quote Vail Resorts' 2025 Form 10-K for their definition of "Destination" and "Regional" resorts, *see* Compl. ¶ 40, but the 10-K uses these terms to describe general operational divisions, not separate products or antitrust markets. Plaintiffs ignore relevant facts within the same document, including that "Destination" and "Regional" resorts compete for the same business: roughly half of customers at Vail Resorts' "Destination" mountains are locals. Form 10-K, at 45; *see Jefferson Parish*, 466 U.S. at 19 (products only distinct where there is separate demand for each).

### B. The Epic Pass Does Not Coerce Anyone Into Buying a Tied Product

Even if "Destination" and "Regional" lift access were separate products, Plaintiffs' claim independently fails because they do not allege coercion—"the crux of tying." *Johns Manville*, 84 F.4th at 1178 (internal quotation omitted). The coercion element requires the seller to exploit its control over the tying product "to force the buyer into the purchase of a tied product." *Id.* Plaintiffs allege no such force. They allege only ordinary price discounts for buying unlimited access (and in advance) that do not in any way punish customers for buying the allegedly tied product—lift access at "Regional Ski Areas"—from other sellers, much less force them to buy it from Vail Resorts.

What's more, Vail Resorts already sells the supposed tying product without the supposed tied product. As Plaintiffs acknowledge, Vail Resorts offers an array of discounted pass products that do not include lift access at "Regional Ski Areas." *See* Compl. ¶ 71. A customer who wants access to Vail Resorts' so-called "Destination Ski Resorts" can therefore buy it without purchasing any "Regional Ski Area" access and without being punished for purchasing that access elsewhere. Where the tying product is freely available on its own, there is no "agreement to sell one product … conditioned on the purchase of the other." *Johns Manville*, 84 F.4th at 1178. In other words, Plaintiffs do not allege that Vail Resorts ever refuses to sell "Destination" lift access unless a customer also purchases "Regional" access. Without a forced tie, there is no tying arrangement. Plaintiffs' own pleading proves the point: one Plaintiff bought individual lift tickets at a Vail Resort, not an Epic Pass. Compl. ¶ 27. That Plaintiff evidently did not experience the purported coercion he alleges in this lawsuit.

### 1. Non-Punitive Discounts Are Not Actionable

Vail Resorts' Epic Passes offer customers a discount for purchasing greater access to its mountain resorts, so long as the customer purchases the pass in advance. Plaintiffs, however, claim the Epic Pass has "a penalty-pricing structure" in that, once a consumer has bought a pass including access to both "Destination Ski Resorts" and "Regional Ski Areas," there is no incremental cost to skiing at one of Vail Resorts' "Regional Ski Areas." Compl. ¶ 128. Plaintiffs argue that, as a result, a skier "would be fully justified in feeling that any additional dollar that he or she may want to spend at a competing ski area that is not covered by the Mega Pass is wasted." *Id.*

But even if a passholder *feels* that way, it is not an antitrust violation—any more than someone who sits down to an all-you-can-eat buffet might feel they would be wasting money by also buying a hamburger at the same location or elsewhere. More pointedly, the Epic Pass's purported "penalty-pricing structure" imposes no penalty at all. Skiers and snowboarders are not penalized for choosing another "Regional Ski Area," nor are they given a larger discount on the Epic Pass if they do most of their "Regional" skiing with Vail Resorts. Instead, Vail Resorts offers discounts for customers who purchase in advance or choose to visit multiple resorts, and those discounts are unaffected by whether or not buyers go elsewhere in the allegedly tied market. As in *Johns Manville*, this arrangement offers consumers a discount on a bundle of goods without punishing them for buying those products from other vendors. As such, it is not an actionable antitrust violation. *Johns Manville*, 84 F.4th at 1181.[7]

---

[7] In *Johns Manville*, the Tenth Circuit found that merely offering a discount on combined

### 2. Plaintiffs Fail to Plead Facts Supporting an Incentive Effect

Plaintiffs likewise fail to allege facts to show that Vail Resorts' discount on Epic Passes provided an unlawful incentive to purchase the tied product. Plaintiffs' theory of coercion is that Vail Resorts sets high single-day lift ticket prices at "Destination" resorts to incentivize pass purchases. *See* Compl. ¶¶ 123–27. But again, even if this were true, that allegation reflects lawful product differentiation, not illegal conduct.

Start with Plaintiffs' pleading failure. The Complaint alleges that Vail Resorts owns or operates 42 ski areas, yet the Complaint identifies allegedly inflated lift-ticket pricing at only five resorts. Compl. ¶¶ 6 (Vail), 102 (Park City), 103 (Stowe), 124 (Vail), Fig. 14 (Vail, Beaver Creek, Breckenridge). For those resorts, Plaintiffs identify only "peak" or "holiday" pricing, or they say that pricing can be "as high as" a certain number. *Id.* Plaintiffs have thus cherry-picked peak prices at a small number of resorts, precluding the Court from assessing the plausibility of Plaintiffs' factual claim of coercively high lift ticket prices at "Destination" resorts generally. Nor do Plaintiffs account for the fact that Vail Resorts offers unbundled pass products that allow guests to enjoy a "Destination" resort without conditioning the sale on purchase of the allegedly tied product. Compl. ¶ 71.

Plaintiffs thus fail to allege facts sufficient to support the theory that consumers who want lift access at "Destination Ski Resorts" are forced to buy tied access to "Destination Ski Resorts" *and* "Regional Ski Areas" rather than (1) lift tickets at one of the

---

purchases of the tying and tied product (with a minimum purchase requirement that incentivized purchasing both from the defendant) was not coercive, contrasting discounts that imposed "penalties or supply shortages" for buying the tied product from other vendors. 84 F.4th at 1181 (quoting *In re EpiPen*, 44 F.4th 959, 997–98 (10th Cir. 2022)).

five identified resorts at non-peak times; (2) lift tickets at one of the 37 other Vail Resorts properties for which Plaintiffs allege no lift-ticket pricing at all; and/or (3) a discounted pass product that does not include "Regional Ski Area" access, including advanced day pass options ranging from one to seven days.[8] Each of those unbundled options is available, Compl. ¶ 71, and Plaintiffs plead no facts showing that any consumer—much less a substantial number—was forced into the bundle.

## II. PLAINTIFFS FAIL TO PLEAD COHERENT RELEVANT MARKETS

Plaintiffs' failure to allege two distinct products infects every aspect of this suit, including the Complaint's failure to plead actionable market definitions, which are essential to any antitrust claim. Plaintiffs' two alleged "markets" are not antitrust markets at all. They are labels—"Destination Ski Resorts" and "Regional Ski Areas"—that Plaintiffs apply so inconsistently that the same mountain lands in either category depending on which paragraph of the Complaint one reads. That matters because a properly defined market is the foundation for everything Plaintiffs must prove next: Vail Resorts' power in the tying market (§ III) and alleged foreclosure of the tied market (§ IV).

A relevant market has two parts—a product market and a geographic market—and each must capture the real-world substitutes consumers actually treat as alternatives. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324–25, 336–39 (1962). Plaintiffs' alleged markets fail on both counts, for three independent reasons: their product-market lines

---

[8] Detailed pricing for resort lift tickets and various pass products are publicly available and subject to judicial notice. *See*, *e.g.*, *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1224–1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web.")

ignore how skiers actually substitute resort options (§ II.A); their own allegations contradict the boundaries they drew (§ II.B); and they never define any geographic market for the tied product (§ II.C).

### A. The Destination/Regional Divide Does Not Track Consumer Substitution

Product markets are defined by "the area of effective competition," meaning they include the products that customers or producers consider substitutes. *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) (quotations and citations omitted). A complaint that "fails to include 'reasonably good substitutes'" has not alleged a relevant market. *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008).

Plaintiffs' alleged product markets ignore the high degree of overlap between consumers of lift access at "Regional Ski Areas" and consumers of lift access at "Destination Ski Resorts." Many skiers patronize both, and high level of overlap between customers for products in two allegedly separate markets suggests that those products compete in the same market. *Endure Indus., Inc. v. Vizient Inc.*, 164 F.4th 405, 415 (5th Cir. 2026) ("The fact that somewhere between a quarter and a third of customers now get their disposal medical supplies elsewhere, outside the proposed GPO market, strongly suggests reasonably available alternatives."); *Campfield v. State Farm Mut. Auto Ins. Co.,* 532 F.3d 1111, 1118 (10th Cir. 2008) (where an alleged market "fails to include 'reasonably good substitutes' then the plaintiff has not adequately alleged a relevant market").

Although Plaintiffs try to distinguish their alleged markets by reference to local versus out-of-town skiers—with out-of-towners purportedly preferring "Destination Ski Resorts"—they fail to account for the fact that "Destination Ski Resorts" and "Regional Ski

Areas," even as loosely defined by Plaintiffs, *do* compete for the same local skiers, especially when the two sit in close geographic proximity. If a skier can travel two hours to a "Regional Ski Area" or two hours to a "Destination Ski Resort," Plaintiffs offer no plausible reason why those two areas would not compete for that skier's business. Plaintiffs' failure to account for these substitutes is fatal to both alleged product markets. *Campfield*, 532 F.3d at 1118.

### B. Plaintiffs' Own Allegations Contradict Their Proposed Markets

Even setting aside the substitution problem, Plaintiffs' proposed definitions of "Destination Ski Resorts" and "Regional Ski Areas" are internally inconsistent and do not reflect actual guest behavior. Because Plaintiffs' own allegations place the same mountains on both sides of the line, these two definitions cannot hold.

First, Plaintiffs define "Regional Ski Areas" as tending to be "located near large population centers." Compl. ¶ 48. But many of their proposed "Destination Ski Resorts" are located near large population centers, too. For example, Vail Mountain, Breckenridge, Keystone, and Beaver Creek are all within two hours of Denver, and Park City is within an hour of Salt Lake City—yet Plaintiffs place each in the "Destination" market. Compl. ¶ 42. Plaintiffs offer no rationale for excluding those nearby resorts from a "Regional" market for Denver and Salt Lake City residents whose proximity supposedly defines that market. *See* Compl. ¶ 51.

Second, and conversely, Plaintiffs allege that "Destination Ski Resorts" include those properties the National Ski Areas Association (NSAA) considers an "Extra-Large" ski mountain. Compl. ¶ 45. Yet Plaintiffs characterize several "Extra-Large" mountains as

"Regional Ski Areas" when it suits their narrative. They allege, for example, that Stowe—an "Extra-Large" mountain more than 300 miles and nearly six hours from New York City, and roughly 200 miles and over three hours from Boston—is "Regional." *See* Compl. ¶¶ 46, 49 (Stowe is #26 on the NSAA Extra-Large list, yet allegedly "[w]ithin driving distance from New York City [and] Boston"). Plaintiffs also label other "Extra-Large" mountains "Regional" even though those mountains are larger, by Plaintiffs' own measure, than resorts they call "Destination"—Mount Snow and Okemo, for instance, each exceed Crested Butte. Compl. ¶¶ 42, 46, 49.

The result is two purported "markets" with no stable content. Definitions that sort the same property into either market depending on which criteria one uses cannot support a coherent product market and make it impossible to assess the effect of Vail Resorts' conduct on competition within those supposed markets. *See Campfield*, 532 F.3d at 1118.

**C. Plaintiffs Do Not Define Any Regional Geographic Market**

Plaintiffs also fail to offer any coherent geographic bounds for lift access at "Regional Ski Areas"—the alleged tied product. Plaintiffs need not define a geographic market "with scientific precision," but they must supply at least a "rough approximation" so that a court can evaluate whether access to the tied product has been foreclosed within it. *United States v. Connecticut Nat'l Bank*, 418 U.S. 656, 669–70 (1974); *Cox*, 871 F.3d at 1104–07. Plaintiffs do not come close. They make no effort to define the size of any regional market—proposing no maximum or range of distance, no travel time from any city, and no limits by metropolitan area. They allege only that "a local skier deciding where to ski on the weekend generally cannot substitute a distant Destination Ski Resort due to

travel time and cost." Compl. ¶ 114. But that conclusory assertion describes no market; it does not say how far is too far, which competitors are in or out, or where any line falls.

This omission is not merely a gap in the pleading—it prevents any assessment of the other elements (e.g., market power and foreclosure) Plaintiffs must show. Similarly to the lack of a viable product market definition, without a defined geographic market for the allegedly tied product, there is no way to identify the universe of consumers in that market, and thus no way to allege that a substantial share of it was foreclosed to competitors. *See infra* § IV.A; *Cox*, 871 F.3d at 1107. For this reason, too, Plaintiffs' claims fail.

## III. PLAINTIFFS FAIL TO PLEAD VAIL RESORTS' MARKET POWER IN THE ALLEGED TYING MARKET

The market-power element asks one question: does Vail Resorts control enough of the tying product to force buyers to accept the tied product? Plaintiffs do not plead facts sufficient to answer it. In fact, they never quantify Vail Resorts' share of anything. The one number they do gesture toward is built by improperly lumping Vail Resorts together with its competitor, Alterra, as though the two ran a single company rather than being the competitors Plaintiffs acknowledge in the Complaint.

Market power is not a minor hurdle. It must constitute "significant market power," not "the mere ability to raise price only slightly, or only on occasion, or only to a few of a seller's many customers." *Johns Manville*, 84 F.4th at 1179–80 (quoting *Grappone, Inc. v. Subaru of New Eng.*, 858 F.2d 792, 796 (1st Cir. 1988)). The reason is intuitive: without power over the tying product, "a customer would not feel obliged to take the tie, as he could simply go elsewhere to buy the tying and tied products separately." *Suture Express*, 851 F.3d at 1039. That is why even large market shares fall short when rivals stand ready

to supply the same product. Courts have rejected tying claims where the defendants held 39% and 33% of the market, *Suture Exp., Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1217, 1220 (D. Kan. 2013), and where a defendant held 40% but no more than its competitors, *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 611–13 (1953). As the leading treatise puts it, the requisite power "is absent when … fellow oligopolists can satisfy all demand for the tying product separately." Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1734a (5th ed. 2025) ("Areeda & Hovenkamp"). This is not a formality Plaintiffs can skip by simply relabeling their theory: market power is *required* whether the alleged tie is judged *per se* or under the rule of reason.

Plaintiffs do not try to clear that bar. Accepting *arguendo* that Plaintiffs could allege a coherent tying market of "Destination Ski Resorts," the Complaint never quantifies Vail Resorts' share of it. At most, Plaintiffs point to the proportion of "Extra-Large" mountains included on the Epic Pass. But that is no proxy for market share, for at least three reasons. First, several mountains on the Epic Pass are not owned or operated by Vail Resorts at all; Vail Resorts merely partners with their owners, and those partner offerings change from year to year. Second, Plaintiffs themselves label some "Extra-Large" mountains as "Regional Ski Areas," contradicting their own definition of the tying market. *See supra* § II.B. Third, several mountains that Plaintiffs call "Destination Ski Resorts"—Vail, Breckenridge, and Park City among them—sit within easy travel distance of major population centers, blurring the very market line Plaintiffs need to hold. *See* Compl. ¶¶ 42, 46. Plaintiffs' internally inconsistent market definitions make it impossible to determine whether Vail Resorts holds enough market power to force anyone to buy anything.

More fundamentally, the only measure of "dominance" Plaintiffs allege is the result of an impermissible move: combining Vail Resorts' share with Alterra's. Compl. ¶¶ 138–39. Plaintiffs improperly allege that Vail Resorts and Alterra "together" "account for a dominant share" of "Destination Ski Resorts." *Id*. But Vail Resorts and Alterra are competitors, fighting to sell access to customers at their competing resorts. *See* Compl. ¶¶ 143–44. Their shares cannot be added together to manufacture market power absent an allegation that they conspired, and Plaintiffs do not allege any coordination between them. *See* Areeda & Hovenkamp ¶ 1734e ("Unless the sellers have conspired with each other to impose tying, our answer is no, for cumulation seems inconsistent with the simplifying purpose of having a per se rule in the first place."). On the contrary, the Complaint alleges that each company adopted its pass strategy unilaterally and independently. Compl. ¶ 144.

Plaintiffs' pleading structure confirms that only Vail Resorts' individual power matters. The Complaint asserts a separate tying count against Vail Resorts based solely on the Epic Pass (Count 1) and a separate count against Alterra based solely on the Ikon Pass (Count 2)—two independent ties imposed by two independent companies. The power relevant to the claim against Vail Resorts is therefore Vail Resorts' own, not a figure Plaintiffs reach only by treating two competitors as one. Stripped of Alterra's share, the Complaint contains no allegation of Vail Resorts' market power at all—and a tying claim without market power fails as a matter of law.

## IV. PLAINTIFFS FAIL TO PLEAD FORECLOSURE IN ANY TIED MARKET

To show that the Epic Pass forecloses competition in a tied market, Plaintiffs also

must allege that the pass locks up a substantial share of that market—diverting a substantial portion of the consumers in it away from Vail Resorts' rivals. *Cox*, 871 F.3d at 1104. That analysis demands both a denominator (how large is the tied market?) and a numerator (how much of it did the alleged tie capture?). *See generally Johns Manville*, 84 F.4th at 1180. Plaintiffs plead neither (§§ IV.A–B). And even if they had, the Complaint alleges at most that some passholders prefer to use access they already paid for—a sunk-cost proposition that every season pass purchase creates and that is not evidence of foreclosure (§ IV.C).

### A. Plaintiffs Plead No Foreclosure Denominator

A foreclosure analysis begins with the size of the tied market—the denominator—and Plaintiffs never provide it. They describe the "Regional Ski Area" markets only as "local or regional, typically defined by reasonable driving distance … from population centers," Compl. ¶ 119, but they never define any actual market's scope or estimate how many consumers it contains. *See supra* § II.C. Without a defined market, there is no way to count the potential consumers in it, and thus no way to allege that a substantial share of them were foreclosed to competitors. *See Cox*, 871 F.3d at 1104-06. This failure is fatal to Plaintiffs' claims.

### B. Plaintiffs Plead No Foreclosure Numerator

Even assuming a definable market, Plaintiffs never allege the numerator: what portion of the consumers in any "Regional" market bought an Epic Pass and were thereby diverted from Vail Resorts' rivals. The lone figure Plaintiffs offer—2.3 million Vail Resorts pass purchasers, Compl. ¶ 70—does not fill the gap. That number is the total of all pass

purchasers nationwide; it says nothing about how many were participants in any particular "Regional Ski Area" market. Pleading the raw volume attributable to a bundle is not enough; Plaintiffs must allege that the bundle forecloses a substantial portion of a defined tied market to competitors. *Cox*, 871 F.3d at 1104. But Plaintiffs never allege what portion of Epic Pass guests would have bought "Regional" lift access had they *not* bought a pass. That's critical because there is no foreclosure when a buyer is "forced to buy a product he would not have otherwise bought even from another seller." *Fox Motors, Inc. v. Mazda Distributors (Gulf), Inc.*, 806 F.2d 953, 958 (10th Cir. 1986) (internal quotation omitted). Absent any allegation of what share of any "Regional" market the Epic Pass captured, Plaintiffs cannot show foreclosure.

### C. Plaintiffs Allege a Sunk-Cost Incentive, Not Foreclosure

Stripped down, Plaintiffs' foreclosure theory is not about excluding competition at all—it is about an alleged "feeling." Plaintiffs posit that an Epic Pass holder "would be fully justified in feeling that any additional dollar that he or she may want to spend at a competing ski area that is not covered by the Mega Pass is wasted." Compl. ¶ 128. But a customer's sense that they should use what they already bought is not the exclusion of a competitor. Feelings are not foreclosure.

A bundle forecloses rivals only when it *penalizes* buyers for going elsewhere. In *Suture Express*, the discount required customers to make 90% of their tied-market purchases from the defendant, so 90% of every discount customer's business was placed beyond competitors' reach. 963 F. Supp. 2d at 1220. The Epic Pass is nothing like that. It imposes no penalty and adjusts no discount when a holder buys lift access at any

"Regional Ski Area"—Vail Resorts' or a competitor's. *See supra* § I.B.1. A pass that leaves consumers free to go elsewhere forecloses nothing.

The experience of one named Plaintiff proves the point. Mr. Sheiner—the only named Plaintiff who purchased a lift ticket from Vail Resorts and lives within several hours of a "Regional Ski Area"—bought individual Vail Resorts lift tickets alongside a season pass (an Ikon Pass). Compl. ¶ 27. His own purchase shows that holding a season pass does not lock a skier out of buying lift access elsewhere—the very behavior Plaintiffs say the bundle forecloses. A consumer who freely buys unbundled lift access in addition to a pass is not a consumer foreclosed to competitors.

## V. THE UNJUST ENRICHMENT CLAIM FAILS WITH THE ANTITRUST CLAIMS

Plaintiffs' unjust enrichment claim fails for the same reasons as their antitrust theory. Unjust enrichment under Colorado law requires (1) a benefit conferred on the defendant, (2) at the plaintiff's expense, (3) under circumstances that make it unjust for the defendant to retain it. *Van Zanen v. Qwest Wireless, LLC*, 550 F. Supp. 2d 1261, 1266–67 (D. Colo. 2007). Plaintiffs' only theory of injustice is the alleged antitrust violation: that they "paid higher prices for lift access" than they would "in a market free of Defendants' … unlawful conduct." Compl. ¶¶ 215, 216–18. Once that conduct is shown to be lawful—as §§ I–IV demonstrate—there is nothing unjust about Vail Resorts charging, and Plaintiffs paying, market prices for a popular pass they chose to buy. A deficient antitrust claim cannot be salvaged by relabeling it as equitable restitution, and Count 5 should thus be dismissed for the same reasons as Counts 1 and 3.

The claim fails for a second, independent reason: Plaintiffs' purchases were

governed by express contracts, and Colorado does not permit recovery in quasi-contract for subject matter covered by an express agreement. *Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003). Plaintiffs allege they purchased Epic Pass products and lift tickets directly from Vail Resorts. Compl. ¶¶ 24, 27; *see* Compl. ¶ 167 (class defined as those who purchased "directly from Defendants"). Those transactions formed binding contracts that fixed the price and terms of the payments Plaintiffs now seek to recover. *See McAuliffe v. Vail Corp.*, 69 F.4th 1130, 1149 (10th Cir. 2023); *Bisaillon v. Vail Resorts, Inc.*, No. 25-cv-2056, 2026 WL 820815, at *6 (D. Colo. Mar. 25, 2026). Because an express contract governs those payments, Plaintiffs cannot recast them as a quasi-contractual debt, and their unjust enrichment claim fails.

## VI. NO NAMED PLAINTIFF CAN MAINTAIN CLASS CLAIMS AGAINST VAIL RESORTS

Even if Plaintiffs had stated a viable claim—and they have not—the class claims against Vail Resorts fail independently of the merits. A lawsuit requires the right plaintiff to sue the right defendant for that defendant's own conduct, and a class action requires a class representative who has standing and actually holds the claim asserted. None of the named Plaintiffs meets those criteria as to Vail Resorts.

Two of the four Plaintiffs—Maybee and Reynolds—lack standing to sue Vail Resorts at all (§ VI.A). The other two—Goloja and Sheiner—expressly waived their right to bring class claims against Vail Resorts. *See* Motion to Strike. With Maybee and Reynolds out for lack of standing and Goloja and Sheiner out by waiver, no named Plaintiff remains to pursue class claims against Vail Resorts, and those claims should be dismissed under Rule 12(b)(1). The same standing defects, addressed below, separately

bar the individual antitrust claims of three Plaintiffs (§ VI.B).

### A. Maybee and Reynolds Lack Article III Standing

Article III standing requires (1) an injury in fact, (2) fairly traceable to the defendant's conduct, that is (3) redressable by the requested relief. *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000). A named plaintiff who seeks to represent a class must show that he "personally has been injured," not merely that injury "has been suffered by other, unidentified members of the class." *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal quotation omitted). And standing must be established as to *each* defendant: a plaintiff injured by one defendant cannot sue another whose conduct did not injure him, "even if [it] engaged in similar conduct that injured other parties." *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 65–66 (2d Cir. 2012).

Maybee and Reynolds cannot make that showing. Neither purchased any pass or lift ticket from Vail Resorts; both allege they bought only from Alterra. Compl. ¶¶ 25–26. Vail Resorts therefore did nothing to injure them, and an injury inflicted by Alterra is not "fairly traceable" to Vail Resorts. *Stevens,* 529 U.S. at 771. Maybee's and Reynolds' claims as to Vail Resorts must be dismissed for lack of standing.

### B. Maybee, Reynolds, and Sheiner Lack Antitrust Standing

Antitrust standing is a separate and more demanding requirement than Article III standing, and three of the four named Plaintiffs cannot satisfy it. To establish antitrust standing, a plaintiff must show "an antitrust injury" and "a direct causal connection between that injury and a defendant's violation of the antitrust laws." *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 882 (10th Cir. 1997). Antitrust

injury is "an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.*

Maybee and Reynolds lack antitrust standing for the same reason they lack Article III standing: they bought nothing from Vail Resorts. By their own pleading, their alleged injury flows from Alterra's use of "economic power" to coerce them into buying Alterra's Ikon Pass. Compl. ¶¶ 189–94. That injury has nothing to do with Vail Resorts.

Sheiner lacks antitrust standing for two reasons. First, Sheiner suffered no antitrust injury. Tying law distinguishes between "the exploitation of market power by merely enhancing the price of the tying product," which is not unlawful, and "attempting to impose restraints on competition in the market for a tied product," which is unlawful. *Cox*, 871 F.3d at 1099 (quoting *Jefferson Parish*, 466 U.S. at 14). Sheiner's only alleged harm is that he paid high prices for individual lift tickets. Compl. ¶ 27. That is a grievance about the price of an unbundled product, not an injury that "flows from" the alleged tie. *Sports Racing*, 131 F.3d at 882. He therefore lacks antitrust standing to sue Vail Resorts.

Second, he is not an "efficient enforcer" of the antitrust laws, as required for antitrust standing. A plaintiff is not an efficient enforcer when other parties "would be more directly harmed by the anticompetitive conduct." *N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*, 162 F.4th 1268, 1274 (10th Cir. 2025) (internal quotation omitted). For a tying claim, an efficient enforcer would be one who bought the bundle products. Sheiner bought only individual lift tickets—not an Epic Pass. Sheiner is therefore not an appropriate plaintiff to bring a tying claim, since he didn't purchase the tie. *Id.* at 1277.

## CONCLUSION

Vail Resorts respectfully asks the Court to dismiss the Complaint in full.

Dated: June 18, 2026

Respectfully submitted,

*/s/ R. Reeves Anderson*
Robert Reeves Anderson
Arnold & Porter Kaye Scholer LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202-2848
Tel: (303) 863-1000
Reeves.Anderson@arnoldporter.com

C. Scott Lent
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
Tel: (212) 836-8000
Scott.Lent@arnoldporter.com

Matthew Tabas
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
Washington, DC 20001
Tel: (202) 942-5000
Email: Matthew.Tabas@arnoldporter.com

*Counsel for Vail Resorts, Inc.*

**CERTIFICATE OF SERVICE (CM/ECF)**

I HEREBY CERTIFY that on June 18, 2026, I electronically filed the foregoing **MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ R. Reeves Anderson*
Robert Reeves Anderson